# JONES *v.* UNITED STATES.

**ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MARYLAND.**

No. 1143. Argued October 29, 1890. — Decided November 24, 1890.

The Guano Islands Act of August 18, 1856, c. 164, reënacted in Rev. Stat. §§ 5570–5578, is constitutional and valid.

Section 6 of the act of August 18, 1856, c. 164, reënacted in Rev. Stat. § 5576, does not assume to extend the admiralty jurisdiction over land, but merely extends the provisions of the statutes of the United States for the punishment of offences upon the high seas to like offences upon guano islands which the President has determined should be considered as appertaining to the United States.

Under Rev. Stat. §§ 730, 5339, 5576, murder committed on a guano island which has been determined by the President to appertain to the United States, may be tried in the courts of the United States for the district into which the offender is first brought.

By the law of nations, when citizens or subjects of one nation, in its name, and by its authority or with its assent, take and hold actual, continuous and useful possession (although only for the purpose of carrying on a particular business, such as catching and curing fish, or working mines,) of territory unoccupied by any other gov ̄nment or its citizens, the nation to which they belong may exercise such jurisdiction and for such period as it sees fit over territory so acquired.

Who is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government.

Courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts of the legislature and executive, although those acts are not formally put in evidence, nor in accord with the pleadings.

In the ascertainment of facts of which judges are bound to take judicial

notice, as in the decision of matters of law which it is their office to know, they may refresh their memory and inform their conscience from such sources as they deem most trustworthy, and as to international affairs may inquire of the Department of State.

The determination of the President, under the act of August 18, 1856, c.164, § 1, (Rev. Stat. § 5570,) that a guano island shall be considered as appertaining to the United States, may be declared through the Department of State, whose acts in this regard are in legal contemplation the acts of the President.

The Island of Navassa in the Caribbean Sea must, by reason of the action of the President, as appearing in documents of the Department of State, be considered as appertaining to the United States.

Under the act of August 18, 1856, c. 164, § 2, (Rev. Stat. § 5574,) a breach of condition of the bond given by the discoverer of a guano island forfeits his private rights only, and does not affect the dominion of the United States over the island, or the jurisdiction of their courts.

THIS cause was argued with No. 1142, *Smith* v. *United States*, and No. 1144, *Key* v. *United States, post*, 224. On the application of the counsel for the several plaintiffs in error it was ordered, that three counsel for plaintiffs in error be allowed to make oral argument herein. The case is stated in the opinion.

*Mr. E. J. Waring, Mr. John Henry Keene, Jr.*, and *Mr. Archibald Stirling* for plaintiffs in error. *Mr. Joseph S. Davis* and *Mr. J. Edward Stirling* were with them on the brief.

*Mr. Attorney General* for defendants in error.

MR. JUSTICE GRAY delivered the opinion of the court.

This was an indictment, found in the District Court of the United States for the District of Maryland, and remitted to the Circuit Court under Rev. Stat. § 1039, alleging that Henry Jones, late of that district, on September 14, 1889, "at Navassa Island, a place which then and there was under the sole and exclusive jurisdiction of the United States, and out of the jurisdiction of any particular State or district of the United States, the same being, at the time of the committing of the

offences in the manner and form as hereinafter stated by the person's hereinafter named, an island situated in the Caribbean Sea, and named Navassa Island, and which was then and there recognized and considered by the United States as containing a deposit of guano, within the meaning and terms of the laws of the United States relating to such islands, and which was then and there recognized and considered by the United States as appertaining to the United States, and which was also then and there in the possession of the United States, under the laws of the United States then and there in force relating to such islands," murdered one Thomas N. Foster, by giving him three mortal blows with an axe, of which he there died on the same day; and that other persons named aided and abetted in the murder. The indictment, after charging the murder in usual form, alleged that the District of Maryland was the District of the United States into which the defendant was afterwards first brought from the Island of Navassa.

The defendant filed a general demurrer, which was overruled, and he then pleaded not guilty. The jury returned a verdict of guilty ; and a bill of exceptions was tendered by the defendant, and allowed by the court, in substance as follows :

At the trial, the United States, to prove that Navassa Island was recognized and considered by the United States as appertaining to the United States, and in the possession of the United States, under the provisions of the laws of the United States in force with regard to such islands, offered in evidence certified copies of papers, from the records of the State Department of the United States, as follows :

A copy of a memorial addressed to the Secretary of State by Peter Duncan, signed and sworn to by him on November 18, 1857, before a commissioner of the Circuit Court of the United States for the District of Maryland, and certified by the present Secretary of State to be " a true copy from Senate Executive Document No. 37, 36th Congress, 1st session, filed in this department with papers relating to the discovery of guano on the Island of Navassa," which was in these words :

"To the Honorable the Secretary of State of the United States:

"Peter Duncan, a citizen of the United States, respectfully represents to the Department of State of the United States that on the first day of July in the year 1857 he did discover a deposit of guano on an island or key in the Caribbean Sea, not within the lawful jurisdiction of any other government, and not occupied by the citizens of any other government, which said island or key is called Navassa, and lies in latitude 18° 10' north, longitude 75° west, forty-five miles or thereabouts from the island of St. Domingo, and seventy miles or thereabouts from the island of Jamaica. The said island of Navassa is about two miles in length and a mile and a half in width, apparently of volcanic origin, and elevated about three hundred feet above the surface of the sea, presenting a rocky, perpendicular cliff or shore on all sides, except for a small space to the north. It is covered with small shrubs upon the surface, beneath which is a deposit of phosphatic guano, varying in depth from one to six feet, and estimated in quantity at one million of tons.

"And said claimant further represents that on the 19th day of September, 1857, he did take peaceable possession of and occupy said island or key of Navassa in the name of the United States, and continues so to occupy the same, and is prepared to furnish satisfactory evidence thereof, and of all others the requisites and facts prescribed by the act of Congress in such case made and provided.

"Wherefore he prays that said key or island of Navassa may be considered and declared as appertaining to the United States, and that he, the said claimant, may have the rights and advantages allowed and secured to him as such discoverer, which are by the act of Congress aforesaid provided.

"PETER DUNCAN."

Also a copy of a proclamation, certified by the present Secretary of State to be "a copy of a proclamation issued by this Department on the 8th day of December, 1859, in respect

to the discovery of guano on the Island of Navassa by Peter Duncan," which was in these words:

"Lewis Cass, Secretary of State of the United States, to all
          to whom these presents shall come, greeting:

"Know ye that Peter Duncan, a citizen of the United States, has filed in this Department the required notice of the discovery of guano on and of the occupation of the Island of Navassa, in the Caribbean Sea, in the name of the United States of America, the same being in north latitude eighteen degrees and ten minutes and in longitude seventy-five degrees west; and that Edward K. Cooper, also a citizen of the United States, and the assignee of the said Peter Duncan, has entered into sufficient bonds under and according to the provisions of the act of the Congress of the United States passed on the eighteenth day of August in the year eighteen hundred and fifty-six; wherefore the said Edward K. Cooper is entitled, in respect to the guano on the said island, to all the privileges and advantages intended by that act to be secured to citizens of the United States who may have discovered deposits of guano; provided always, that the said Edward K. Cooper shall abide by the conditions and requirements imposed by the act of Congress aforesaid.

"In witness whereof I, Lewis Cass, Secretary of State of the United States of America, have hereunto set my hand and caused the seal of the Department of State to be affixed at Washington this eighth day of December, 1859.
          [SEAL.]                                    "LEWIS CASS."

The United States further proved that on September 14, 1889, the Island of Navassa was in the possession of the Navassa Phosphate Company, incorporated by the State of New York, and which held the island as assignee of Duncan and Cooper, mentioned in the foregoing papers; that the persons then "on the island consisted of 137 colored laborers of said company, and 11 white officers or superintendents, all residents of the United States, appointed by the company; the laborers, including the defendant, being employed in

digging the phosphate or guano and transporting by railroad propelled by man power and handling the phosphate or guano found on the island and putting it on shipboard, which digging and mining is carried on by digging and blasting with dynamite and working with picks and other iron tools, and which phosphate or guano so mined is the article called Navassa phosphate in the market, and is the only substance on the island which is dug, mined, worked, transported or sold, the said laborers being shipped at Baltimore under shipping articles," a copy of which is in the margin [1]; that on that day

_____

[1] Navassa Phosphate Company, 20 & 22 South Street, Baltimore.

This agreement, made at Baltimore the 12th day of January, 1889, by and between the Navassa Phosphate Company, of the first part, and the undersigned laborers of the United States, of the second part, as follows:

Said laborers agree to proceed, under the orders and instructions of said Navassa Phosphate Company, or its agents, on board such vessel as shall be provided for the purpose, to Navassa Island, for the business of assisting in loading of vessels with cargo, either by working on shore or in boats; and for this purpose the parties of the second part hereby covenant and agree to devote their whole time and services in such labor as they may be directed to do by said Navassa Phosphate Company or its agents, and for as many months as the said Navassa Phosphate Company may desire, not exceeding in all fifteen months from the time of arriving at Navassa Island, until discharged therefrom, at which time their wages are to commence and cease. And the said Navassa Phosphate Company agrees on its part to pay said undersigned the monthly wages set opposite their respective names, and to furnish a free passage to and from said island of Navassa, and further to find said undersigned laborers in the usual provisions furnished to such laborers, free of all expense to the parties of the second part.

Payment of wages to be made on the return of the parties of second part to Baltimore. And should they fail to obey the orders and instructions of said Navassa Phosphate Company, or its agents, or refuse at any time to labor, they shall forfeit all claim for wages and compensation which may be due them.

If said Navassa Phosphate Company fails to comply with this agreement on its part, it shall forfeit the sum of twenty dollars, in addition to full monthly wages and free passage, to the parties of the second part to this contract. The parties of the second part further agree, in case of sickness or lost time, to pay the said Navassa Phosphate Company fifty cents per day board, and said Navassa Phosphate Company not to be liable for any wages or compensation for time lost by the parties of the second part by sickness or otherwise.

The parties of the second part agree, upon signing the contract, to obey

a riot took place there, in which a large number of laborers was engaged against the officers, and the defendant killed Thomas N. Foster, one of the officers, under circumstances which the jury found amounted to murder, as charged in the indictment; and that afterwards the defendant was first brought into the District of Maryland, as therein charged.

Evidence offered by the defendant that on April 16, 1889,

---

and abide by all the rules, regulations and laws that may now be in operation or hereafter put in force on the island of Navassa, West Indies, for the better protection of life and property, and that may be deemed necessary for police protection and discipline of the island; and release said Navassa Phosphate Company from any and all liability for any injury arising from accident, or from any acts of any officer or employé on the island of Navassa.

It is further understood and agreed to by the parties of the second part that, in case they are not competent to perform the duties as herein stated, they to pay their passage back to the United States, and the party of the first part not to be liable for any wages whatsoever. It is also understood that fifty cents per month shall be deducted from the wages of the parties of the second part for medicines and medical attention.

NAVASSA PHOSPHATE COMPANY,
Per JOHN H. HASKELL, for the Company.

In consideration to the foregoing, and the advance wages set opposite our names, the receipt whereof is hereby acknowledged, we have signed this contract, in duplicate, as witness our hands:

| Signatures. | | | | | | Monthly wages. | | Advance paid. | | Witness to signature and payment. | | | Age. | | Place of Birth. | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No. 14. Henry Jones ... | | | | | | $8.00 | | $10.00 | | | 4—1 | | | 22 | Baltimore. | | |
| * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * |
| * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * | * |

We hereby certify that we, the undersigned, were present on board the brig Romance, in the harbor of Baltimore, Md., when the above-named men acknowledged that they had signed the above contract, and that they were willing to go to Navassa Island, W. I., and obey all orders, rules and regulations; that the advance set opposite their respective names was correct, and that they had received the money.

CHARLES BROWN, Master.
FREDERICK ABBOTT, Mate.
Baltimore, January 12th, 1889.    JOHN W. PEED, Shipper.

a foreign vessel was loading at Navassa with a cargo of this phosphate of lime, intended for the use of persons other than citizens or residents of the United States, and finished such loading a few days afterwards, was excluded by the court as immaterial; and the defendant excepted to its exclusion.

After verdict, the defendant moved in arrest of judgment, for various reasons, the only one of which, relied on in argument, was this: "Because the act of August 18, 1856, c. 164, now codified with amendments as Title 72 of the Revised Statutes of the United States, is unconstitutional and void, and the court was without jurisdiction to try the defendant under the indictment found against him."

The motion was overruled, and the defendant sentenced to death; and he sued out this writ of error under the act of February 6, 1889, c. 113, § 6. 25 Stat. 656.

The provisions of the act of Congress of August 18, 1856, c. 164, entitled "An Act to authorize Protection to be given to Citizens of the United States who may discover Deposits of Guano," (11 Stat. 119,) since reënacted in Title 72, §§ 5570–5578, of the Revised Statutes, are as follows:

By section 1, when any citizen of the United States shall "discover a deposit of guano on any island, rock or key, not within the lawful jurisdiction of any other government, and not occupied by the citizens of any other government, and shall take peaceable possession thereof, and occupy the same, said island, rock or key may, at the discretion of the President of the United States, be considered as appertaining to the United States;" provided that the discoverer, as soon as practicable, shall give notice, on oath, to the State Department of the United States, of such discovery, occupation and possession, describing the island, its latitude and longitude, and showing that such possession was taken in the name of the United States, and shall furnish to the State Department satisfactory evidence that the island was not, at the time of his discovery, possession or occupation, in the possession or occupation of any other government or its citizens. All the facts and conditions thus specified must appear to the satisfaction of the President, in order to enable him to exercise the discre-

tionary power conferred upon him of determining that the island shall be considered as appertaining to the United States.

When the President determines that the island shall be considered as appertaining to the United States, and not before, section 2 of the statute authorizes him to allow the discoverer or his assigns the exclusive right, subject to be terminated by Congress at any time, of occupying the island for the purpose of obtaining and selling the guano, first giving bond, with such penalties and securities as may be required by the President, "to deliver the said guano to citizens of the United States, for the purpose of being used therein, and to none others," "and to provide all necessary facilities for that purpose within a time to be fixed in said bond." And, by the same section, any breach of the conditions of the bond "shall be taken and deemed a forfeiture of all rights accruing under and by virtue of this act."

The scope and effect of the first two sections, as above stated, clearly appear on the face of the act, and were pointed out in opinions given by Attorney General Black to the Secretary of State on June 2, 1857, and July 12, 1859. 9 Opinions of Attorneys General, 30, 364. See also a letter of the Secretary of State of July 1, 1857, in 3 Wharton's International Law Digest, § 311.

The other sections of the act manifestly apply only to islands which the President has determined shall be considered as appertaining to the United States.

By section 3, "the introduction of guano from such islands, rocks or keys shall be regulated as in the coasting trade between different ports of the United States, and the same laws shall govern the vessels concerned therein." By section 4, "nothing in this act contained shall be construed obligatory on the United States to retain possession of the islands, rocks or keys as aforesaid, after the guano shall have been removed from the same." And by section 5, "the President of the United States is hereby authorized, at his discretion, to employ the land and naval forces of the United States to protect the rights of the said discoverer or discoverers, or their assigns, as aforesaid."

By section 6 of the same act, reënacted in section 5576 of the Revised Statutes, all acts done, and offences or crimes committed, on any such island, rock or key, by persons who may land thereon, or in the waters adjacent thereto, "shall be held and deemed to have been done or committed on the high seas, on board a merchant ship or vessel belonging to the United States, and be punished according to the laws of the United States relating to such ships or vessels and offences on the high seas; which laws, for the purposes aforesaid, are hereby extended to and over such islands, rocks or keys."

This section does not (as argued for the defendant) assume to extend the admiralty jurisdiction over land; but, in the exercise of the power of the United States to preserve peace and punish crime in all regions over which they exercise jurisdiction, it unequivocally extends the provisions of the statutes of the United States for the punishment of offences committed upon the high seas to like offences committed upon guano islands which have been determined by the President to appertain to the United States. In either case, the crime, the punishment and the procedure are statutory, the whole criminal jurisdiction of the courts of the United States being derived from acts of Congress. *United States* v. *Hudson*, 7 Cranch, 32; *United States* v. *Britton*, 108 U. S. 199, 206.

By the Constitution of the United States, while a crime committed within any State must be tried in that State and in a district previously ascertained by law, yet a crime not committed within any State of the Union may be tried at such place as Congress may by law have directed. Constitution, art. 3, § 2; Amendments, art. 6; *United States* v. *Dawson*, 15 How. 467, 488. Congress has directed that "the trial of all offences committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought." Rev. Stat. § 730. And Congress has awarded the punishment of death to the crime of murder, whether committed upon the high seas or other tide waters out of the jurisdiction of any particular State, or "within any fort, arsenal, dock-yard, magazine or in any other place or district of

country under the exclusive jurisdiction of the United States."
Rev. Stat. § 5339. Both these acts of Congress clearly include
murder committed on any land within the exclusive juris-
diction of the United States and not within any judicial dis-
trict, as well as murder committed on the high seas. *Ex parte
Bollman*, 4 Cranch, 75, 136; *United States* v. *Bevans*, 3 Wheat.
336, 390, 391; *United States* v. *Arwo*, 19 Wall. 486.

By the law of nations, recognized by all civilized States,
dominion of new territory may be acquired by discovery and
occupation, as well as by cession or conquest; and when citi-
zens or subjects of one nation, in its name, and by its author-
ity or with its assent, take and hold actual, continuous and
useful possession, (although only for the purpose of carrying
on a particular business, such as catching and curing fish, or
working mines,) of territory unoccupied by any other govern-
ment or its citizens, the nation to which they belong may
exercise such jurisdiction and for such period as it sees fit over
territory so acquired. This principle affords ample warrant
for the legislation of Congress concerning guano islands.
Vattel, lib. 1, c. 18; Wheaton on International Law (8th ed.)
§§ 161, 165, 176, note 104; Halleck on International Law,
c. 6, §§ 7, 15; 1 Phillimore on International Law (3d ed.) §§ 227,
229, 230, 232, 242; 1 Calvo Droit International (4th ed.)
§§ 266, 277, 300; *Whiton* v. *Albany Ins. Co.*, 109 Mass. 24, 31.

Who is the sovereign, *de jure* or *de facto*, of a territory is
not a judicial, but a political question, the determination of
which by the legislative and executive departments of any
government conclusively binds the judges, as well as all other
officers, citizens and subjects of that government. This prin-
ciple has always been upheld by this court, and has been
affirmed under a great variety of circumstances. *Gelston* v.
*Hoyt*, 3 Wheat. 246, 324; *United States* v. *Palmer*, 3 Wheat.
610; *The Divina Pastora*, 4 Wheat. 52; *Foster* v. *Neilson*, 2
Pet. 253, 307, 309; *Keane* v. *McDonough*, 8 Pet. 308; *Garcia*
v. *Lee*, 12 Pet. 511, 520; *Williams* v. *Suffolk Ins. Co.*, 13 Pet.
415; *United States* v. *Yorba*, 1 Wall. 412, 423; *United States*
v. *Lynde*, 11 Wall. 632, 638. It is equally well settled in
England. *The Pelican*, Edw. Adm. appx. D; *Taylor* v. *Bar-*

clay, 2 Sim. 213; *Emperor of Austria* v. *Day*, 3 DeG., F. & J. 217, 221, 233; *Republic of Peru* v. *Peruvian Guano Co.*, 36 Ch. D. 489, 497; *Republic of Peru* v. *Dreyfus*, 38 Ch. D. 348, 356, 359.

In *Williams* v. *Suffolk Ins. Co.*, in an action on a policy of insurance, the following question arose in the Circuit Court, and was brought up by a certificate of division of opinion between the judges thereof:

"Whether, inasmuch as the American government has insisted and does still insist, through its regular executive authority, that the Falkland Islands do not constitute any part of the dominions within the sovereignty of the government of Buenos Ayres, and that the seal fishery at those islands is a trade free and lawful to the citizens of the United States, and beyond the competency of the Buenos Ayrean government to regulate, prohibit or punish; it is competent for the Circuit Court in this cause to inquire into and ascertain by other evidence the title of said government of Buenos Ayres to the sovereignty of the said Falkland Islands, and, if such evidence satisfies the court, to decide against the doctrines and claims set up and supported by the American government on this subject; or whether the action of the American government on this subject is binding and conclusive on this court as to whom the sovereignty of those islands belongs." 13 Pet. 417.

This court held that the action of the executive department, on the question to whom the sovereignty of those islands belonged, was binding and conclusive upon the courts of the United States, saying: "Can there be any doubt that when the executive branch of the government, which is charged with our foreign relations, shall in its correspondence with a foreign nation assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department? And in this view it is not material to inquire, nor is it the province of the court to determine, whether the executive be right or wrong. It is enough to know, that in the exercise of his constitutional functions he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the

Union." ". In the present case, as the executive in his message, and in his correspondence with the government of Buenos Ayres, has denied the jurisdiction which it has assumed to exercise over the Falkland Islands, the fact must be taken and acted on by this court as thus asserted and maintained." 13 Pet. 420.

All courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the govern- ment whose laws they administer, or of its recognition or denial of the sovereignty of a foreign power, as appearing from the public acts of the legislature and executive, although those acts are not formally put in evidence, nor in accord with the pleadings. *United States* v. *Reynes*, 9 How. 127; *Kennett* v. *Chambers*, 14 How. 38; *Hoyt* v. *Russell*, 117 U. S. 401, 404; *Coffee* v. *Grover*, 123 U. S. 1; *State* v. *Dunwell*, 3 R. I. 127; *State* v. *Wagner*, 61 Maine, 178; *Taylor* v. *Barclay*, and *Emperor of Austria* v. *Day*, above cited; 1 Greenl. Ev. § 6.

In *United States* v. *Reynes*, upon the question whether a Spanish grant of land in Louisiana was protected, either by the treaty of retrocession from Spain to France, or by the treaty of Paris, by which the Territory of Louisiana was ceded to the United States, this court held: "The treaties above mentioned, the public acts and proclamations of the Spanish and French governments, and those of their publicly recog- nized agents, in carrying into effect those treaties, though not made exhibits in this cause, are historical and notorious facts, of which the court can take regular judicial notice, and refer- ence to which is implied in the investigation before us." 9 How. 147, 148.

In *Kennett* v. *Chambers*, a bill to compel specific perform- ance of a contract made in the United States in September, 1836, by which a general in the Texan Army agreed to con- vey lands in Texas, in consideration of money paid him to aid in raising and equipping troops against Mexico, was dismissed on demurrer, because the independence of Texas, though pre- viously declared by that State, had not then been acknowl- edged by the government of the United States; and the court established this conclusion by referring to messages of the

President of the United States to the Senate, a letter from the President to the Governor of Tennessee, and a note from the Secretary of State to the Mexican Minister, none of which were stated in the record before the court. 14 How. 47, 48.

So in *Coffee* v. *Grover*, upon writ of error to the Supreme Court of Florida, in a case involving a title to land, claimed under conflicting grants from the State of Florida and the State of Georgia, and depending upon a disputed boundary between those States, this court ascertained the true boundary by consulting public documents, some of which had not been given in evidence at the trial, nor referred to in the opinion of the court below. 123 U. S. 11 *& seq.*

In *Taylor* v. *Barclay*, a bill in equity, based on an agreement which it alleged had been made in 1825 by agents of "the government of the Federal Republic of Central America, which was a sovereign and independent State, recognized and treated as such by His Majesty the King of these Realms," was dismissed on demurrer by Vice-Chancellor Shadwell, who said: "I have had communication with the Foreign Office, and I am authorized to state that the Federal Republic of Central America has not been recognized as an independent government by the government of this country." "Inasmuch as I conceive it is the duty of the judge in every court to take notice of public matters which affect the government of this country, I conceive that, notwithstanding there is this averment in the bill, I am bound to take the fact as it really exists, not as it is averred to be." "Nothing is taken to be true, except that which is properly pleaded; and I am of opinion that, when you plead that which is historically false, and which the judges are bound to take notice of as being false, it cannot be said you have properly pleaded, merely because it is averred, in plain terms; and that I must take it just as if there was no such averment on the record." 2 Sim. 220, 221, 223.

That case is in harmony with decisions made in the time of Lord Coke, and in which he took part, that against an allegation of a public act of Parliament, of which the judges ought to take notice, the other party cannot plead *nul tiel record*,

but, if the act be misrecited, ought to demur in law upon it. *The Prince's Case*, 8 Rep. 14a, 28a; *Woolsey's Case*, Godb. 178.

In the ascertainment of any facts of which they are bound to take judicial notice, as in the decision of matters of law which it is their office to know, the judges may refresh their memory and inform their conscience from such sources as they deem most trustworthy. Gresley Eq. Ev. pt. 3, c. 1; *Fremont* v. *United States*, 17 How. 542, 557; *Brown* v. *Piper*, 91 U. S. 37, 42; *State* v. *Wagner*, 61 Maine, 178. Upon the question of the existence of a public statute, or of the date when it took effect, they may consult the original roll or other official records. *Spring* v. *Eve*, 2 Mod. 240; 1 Hale's Hist. Com. Law (5th ed.) 19–21; *Gardner* v. *Collector*, 6 Wall. 419; *South Ottawa* v. *Perkins*, 94 U. S. 260, 267–269, 277; *Post* v. *Supervisors*, 105 U. S. 667. As to international affairs, such as the recognition of a foreign government, or of the diplomatic character of a person claiming to be its representative, they may inquire of the Foreign Office or the Department of State. *Taylor* v. *Barclay*, above quoted; *The Charkieh*, L. R. 4 Ad. & Ec. 59, 74, 86; *Ex parte Hitz*, 111 U. S. 766; *In re Baiz*, 135 U. S. 403.

In the case at bar, the indictment alleges that the Island of Navassa, on which the murder is charged to have been committed, was at the time under the sole and exclusive jurisdiction of the United States, and out of the jurisdiction of any particular State or district of the United States, and recognized and considered by the United States as containing a deposit of guano within the meaning and terms of the laws of the United States relating to such islands, and recognized and considered by the United States as appertaining to the United States and in the possession of the United States under those laws.

These allegations, indeed, if inconsistent with facts of which the court is bound to take judicial notice, could not be treated as conclusively supporting the verdict and judgment. But, on full consideration of the matter, we are of opinion that those facts are quite in accord with the allegations of the indictment.

The power, conferred on the President of the United States by section 1 of the act of Congress of 1856, to determine that a guano island shall be considered as appertaining to the United States, being a strictly executive power, affecting foreign relations, and the manner in which his determination shall be made known not having been prescribed by statute, there can be no doubt that it may be declared through the Department of State, whose acts in this regard are in legal contemplation the acts of the President. *Wolsey* v. *Chapman,* 101 U. S. 755, 770; *Runkle* v. *United States,* 122 U. S. 543, 557; 11 Opinions of Attorneys General, 397, 399.

On referring to the memorial sworn to by Peter Duncan on November 18, 1857, and to the Proclamation of the Secretary of State of December 8, 1859, (copies of both of which, verified by the present Secretary of State, were given in evidence at the trial of this case,) and to other papers of intermediate dates, filed in the Department of State, communicated by the President to the Senate on April 12, 1860, and printed by order of the Senate in Executive Document No. 37 of the first session of the Thirty-sixth Congress, the following facts appear in regard to the Island of Navassa:

Duncan's memorial on oath was presented to the Secretary of State on December 3, 1857. In that memorial, Duncan represented that on July 1, 1857, he discovered a deposit of guano on an island called Navassa, not within the lawful jurisdiction of any other government, and not occupied by the citizens of any other government; described the island, its latitude and longitude, and the deposit of guano thereon; and further represented that on September 19, 1857, he took peaceable possession of and occupied the island in the name of the United States and continued so to occupy it, and was prepared to furnish satisfactory evidence thereof, and of all other requisites and facts prescribed by the act of Congress of 1856; and prayed that the island "may be considered and declared as appertaining to the United States, and that he, the said claimant, may have the rights and advantages allowed and secured to him as such discoverer, which are by the act of Congress aforesaid provided."

On April 23, 1858, Cooper, the assignee of Duncan, addressed a letter to the Secretary of State, requesting protection of his vessels lying and men working at the Island of Navassa against an apprehended interference by a vessel of war of the Haytian government.

On April 24, 1858, Cooper presented to the Secretary of State an affidavit, sworn to March 15, 1858, before the United States consul at Kingston in the Island of Jamaica, of John B. Lewis, that, as Duncan's agent, he had been since September 18, 1857, " in peaceable possession of the said island, taking and shipping guano therefrom, and that said island was not, when he so took possession thereof, in the possession or occupation of any other government or its citizens, and that the possession of said Duncan through said Lewis and the said Duncan's other agents has not been in any wise interrupted or sought to be interrupted by any person whatsoever."

In June, 1858, Cooper, by letters addressed to the President and to the Secretary of State, informed them that the Haytian government, upon the pretence that the island of Navassa was a dependency of St. Domingo, had sent two vessels of war there, and forcibly interrupted and prohibited the digging of guano by Cooper's men; and solicited the interposition of the United States for the protection of his interests.

On July 7, 1858, the Secretary of State addressed a letter to the Secretary of the Navy, in which, after stating the substance of Duncan's memorial and of Cooper's application, he said : " The President being of the opinion that any claim of the Haytian government to prevent citizens of the United States from removing guano from the Island of Navassa is unfounded, and that in this case it is advisable to exercise the authority vested in him by the fifth section of the act of Congress, approved August 18, 1856, entitled ' An act to authorize protection to be given to citizens of the United States who may discover deposits of guano,' directs that you will cause a competent force to repair to that island, and will order the officer in command thereof to protect citizens of the United States in removing guano therefrom against any interference from authorities of the government of Hayti, or of any other

government. If any persons in the employment of that government should be found upon the island, an offer may be made to land them at Port au Prince, or at any other point which they may designate, and their superiors may be informed of the occasion for this proceeding, and of the determination of this government not to allow the removal of guano from that island by citizens of the United States to be interfered with in any manner by the citizens or authorities of Hayti, or by persons claiming to act under them. It is hoped that the President's object may, by firmness and discretion, be accomplished, not only without any effusion of blood, but without giving reasonable cause for offence in any quarter."

The Secretary of State, on July 8, sent to Cooper a copy of this letter; on July 12, demanded of Cooper a bond as required by the act of 1856, and on September 10, 1858, accepted such a bond; and on September 16 sent him a copy of dispatches received by the Navy Department from the commander of the vessel ordered to Navassa, including letters written by him at Port au Prince on August 16, 1858, to the Haytian Minister of Foreign Relations, to the United States consul at that port, and to Cooper's agent on the Island of Navassa, informing each of them of the object of his mission.

In the letter to the Haytian Minister of Foreign Relations, the commander said: "I am authorized to say to you that the President of the United States is of opinion that, in this case, it is advisable to exercise the authority vested in him by the fifth section of this act, and I am directed by him to repair to that island to protect our citizens in removing guano therefrom against any interference from the authorities of any government whatever; which he hopes I may be able to do without giving reasonable cause of offence in any quarter."

On November 13, 1858, Mr. B. C. Clark, the commercial agent of Hayti at Boston, in behalf of the Haytian government, (intercourse between that government and the United States being at that time conducted through consuls or commercial agents only,[1]) addressed to the Secretary of State a

---

[1] Acts of August 18, 1856, c. 127, 11 Stat. 52, 54; June 5, 1862, c. 96, and July 11, 1862, c. 143, § 1, 12 Stat. 421, 534.

letter in relation to the occupancy of the Island of Navassa by citizens of the United States, in which he said: "The territory over which Hayti now claims sovereignty was once the property of Spain, who, in the exercise of an undisputed right, ceded said territory to France. France, in 1825, through her chief, Charles X, acknowledged the independence of Hayti, and thereby vested her with a perfect title to the 'French part' (popularly termed) and all its dependencies, among which dependencies the islands of Tortugas, La Vache, Caye-mete, Navassa and Gonaive Island are declared to be. The government of Hayti, although frequently importuned, has never ceded, sold or leased either of these dependencies to any nation, company or individual. I therefore most respectfully ask, in behalf of the government of Hayti, the attention of the government of the United States to the infringement on the rights of Hayti, involved in the unauthorized occupancy of Navassa Island by citizens of the United States."

On November 17, 1858, the Assistant Secretary of State replied to Mr. Clark, saying: "I am directed to inform you that a citizen of the United States having exhibited to this department proofs which were deemed sufficient that that island was derelict and abandoned, with guano of good quality, and having applied for the protection of this government in removing the guano therefrom, pursuant to the act of Congress of the 18th of August, 1856, a copy of which is inclosed, that application has been granted., You will notice, however, that the act does not make it obligatory upon the government to retain permanent possession of the island."

On December 8, 1859, the Secretary of State issued a proclamation, addressed "to all to whom these presents shall come," declaring that Duncan, a citizen of the United States, had filed in the Department of State the required notice of the discovery of guano on, and of the occupation of, the Island of Navassa, in the name of the United States; and that Cooper, his assignee, also a citizen of the United States, had entered into sufficient bonds under and according to the act of Congress of August 18, 1856; and therefore that Cooper was "entitled, in respect to the guano on the said

island, to all the privileges and advantages intended by that act to be secured to citizens of the United States who may have discovered deposits of guano," provided that he should abide by the conditions and requirements of that act.

The opinion submitted by Attorney General Black to the Secretary of State on December 14, 1859, (9 Opinions of Attorneys General, 406,) to the effect that the President has no right under the law to annex a guano island to the United States, or to put American citizens in possession of it, while a diplomatic question as to the jurisdiction over it is pending between the United States and a foreign nation, cannot influence our decision in this case, for several reasons. In the first place, that opinion was given six days after the proclamation regarding the Island of Navassa, and concerned only a distinct island, Cayo Verde, claimed by the British government as within its jurisdiction and belonging to the Bahamas. In the next place, no diplomatic question was then pending as to the jurisdiction over the Island of Navassa; on the contrary, the President had repeatedly declared that the claim of Hayti was unfounded. Lastly, the office of the Attorney General was to advise the President what he ought to do; the duty of the judiciary is to decide in accordance with what the President, in the exercise of a discretionary power confided to him by the Constitution and laws, has actually done. As was adjudged, under like circumstances, in *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415, 420, before quoted, if the executive, in his correspondence with the government of Hayti, has denied the jurisdiction which it claimed over the Island of Navassa, the fact must be taken and acted on by this court as thus asserted and maintained; it is not material to inquire, nor is it the province of the court to determine, whether the executive be right or wrong; it is enough to know that in the exercise of his constitutional functions he has decided the question.

The documents from the State Department, above mentioned, show the following action of the President, through the Secretary of State, with regard to the Island of Navassa:

In the order of July 7, 1858, sending out an armed vessel under section 5 of the act of 1856 to protect Cooper in removing

the guano, the President unequivocally declared his "opinion that any claim of the Haytian government to prevent citizens of the United States from removing guano from the island of Navassa is unfounded," and "the determination of this government not to allow the removal of guano from that island by citizens of the United States to be interfered with in any manner by the citizens or authorities of Hayti."

In the response of November 17, 1858, to the letter of the Haytian government, through its commercial agent, claiming the Island of Navassa as a dependency of Hayti, the President declared that a citizen of the United States had exhibited proofs which were deemed sufficient that "that island was derelict and abandoned, with guano of good quality;" and that his application for the protection of the government in removing the guano therefrom, pursuant to the act of Congress of 1856, had been granted. The reference, at the close of this response, to the provision in section 4 of that act, reserving the right of the United States to discontinue its possession of the island after, by the removal of the guano, it shall have ceased to be of any value, has, to say the least, no tendency to show that the United States had not for the time being assumed dominion over the island.

In the proclamation of December 8, 1859, after reciting the discovery and occupation of the island by Duncan, and the giving of a bond by his assignee Cooper, pursuant to the act of 1856, Cooper was declared to be "entitled, in respect to the guano on the said island, to all the privileges and advantages intended by that act to be secured to citizens of the United States who may have discovered deposits of guano." Although this proclamation does not in terms follow the first clause of the prayer of Duncan's memorial, "that said key or island of Navassa may be considered and declared as appertaining to the United States," the declaration of the President, in accordance with the conclusion of that prayer, that Cooper, as Duncan's assignee, was entitled, in respect to the guano upon that island, to the privileges and advantages secured by the act of Congress to citizens of the United States discovering deposits of guano, is equivalent to a declaration that the Pres-

ident considered the island as appertaining to the United States.

Seeing that the act of Congress had not authorized any rights or privileges to be allowed to the discoverer of a guano island, or any bond to be required of him, or any protection to be given to him, by the United States, unless the President was of opinion that the island should be considered as appertaining to the United States, the terms of the order of the President of July 7, 1858, of his response of November 17, 1858, to the protest of the official representative of Hayti, and of his proclamation of December 8, 1859, clearly show, or necessarily imply, that the President, exercising the discretionary power conferred upon him by the Constitution and laws, was satisfied that the Island of Navassa was not within the jurisdiction of Hayti, or of any foreign government, and that it should be considered as appertaining to the United States.

But the case does not rest here. The subsequent action of the President, through the appropriate departments, has put the matter beyond all question.

In a circular of the Treasury Department of February 12, 1869, " relative to the Guano Islands appertaining to the United States," and addressed " to collectors of customs," the Secretary of the Treasury said: " You will find hereto annexed a corrected list of the Guano Islands, bonded under the act of August 18, 1856, as appears by the bonds and papers, transmitted from the Department of State, now on file in the office of the First Comptroller of the Treasury. The several islands named and described in said list having been duly bonded, and considered by the President of the United States ' as appertaining to the United States,' in manner and form prescribed by said act, and, as a consequence thereof, brought under the laws regulating the coasting trade, your attention is directed to the same with a view to the proper enforcement of the laws regulating intercourse with said islands." The list, annexed to that circular, of " Guano Islands pertaining to the United States and bonded under the act of August 18, 1856," included the Island of Navassa.

Finally, by letters from the Secretary of State to the Hay-tian minister on December 31, 1872, and on June 10, 1873, (mentioned, under mistaken dates, in 3 Wharton's International Law Digest, § 312, and copies of which have been obtained from the Department of State,) it appears that, upon the Hay-tian government renewing its claim to the Island of Navassa, the United States utterly and finally denied the validity of the claim, and reasserted and maintained their exclusive jurisdiction of that island, by reason of its discovery and occupation by Duncan and Cooper, and under the act of Congress of 1856.

The only other point presented by the record and argued in behalf of the defendant is his exception to the exclusion of evidence that in April, 1889, a foreign vessel was loaded at Navassa with guano intended for the use of persons other than citizens or residents of the United States. It was argued that this evidence was admissible, as showing a breach of condition of Cooper's bond, and a consequent forfeiture of his rights, under the provision of section 2 of the act of 1856, reënacted in Rev. Stat. § 5574. It does not distinctly appear whether such breach took place before or after April 18, 1889. If it took place before, it was within the period of five years, during which the operation of that provision of the statute was suspended by the act of April 18, 1884, c. 24. 23 Stat. 11. But, whenever the breach took place, it affected the private rights only of the delinquent, and did not impair the dominion of the United States or the jurisdiction of their courts.

For the reasons above stated, our conclusion is that the Guano Islands Act of August 18, 1856, c. 164, reënacted in Title 72 of the Revised Statutes, is constitutional and valid; that the Island of Navassa must be considered as appertaining to the United States; that the Circuit Court of the United States for the District of Maryland had jurisdiction to try this indictment; and that there is no error in the proceedings.

*Judgment affirmed.*