#### AGENCY OF CANADIAN CAR & FOUNDRY CO., Limited, et al., v. AMERICAN CAN CO.

(District Court, S. D. New York. August 5, 1918.)

1. CONSTITUTIONAL LAW ⟨⟩68(1)—DISTRIBUTION OF GOVERNMENTAL POWERS—EXECUTIVE DEPARTMENT.

The question of the sovereignty of a foreign government is a political question determination of which by the executive or legislative department of the United States government binds the judicial department.

2. EVIDENCE ⟨⟩334(1)—LAW OF FOREIGN COUNTRY—CERTIFICATE OF AMBASSADOR.

The certificate of the ambassador of a foreign country to the United States as to the law of his country or the personnel and authority of officials of his government is admissible in the courts of the United States.

3. INTERNATIONAL LAW ⟨⟩9—EFFECT OF CHANGE OF SOVEREIGNTY.

The principle is firmly established in our courts that the rights and liabilities of a state are unaffected by a change either in the form or personnel of its government, however accomplished, whether by revolution or otherwise.

4. TRIAL ⟨⟩55—RECEPTION OF EVIDENCE—DISCRETION OF COURT—WAR CONDITIONS.

The trier of facts may determine whether as matter of fact a cable dispatch purporting to be sent by authority of a foreign government is genuine and was sent as indicated, war exigencies requiring that court shall deal with such situations in a sensible way, not too much fettered by inelastic rules while safeguarding against reception in evidence of fabricated communications.

In Equity. Suit by the Agency of the Canadian Car & Foundry Company, Limited, and the Recording & Computing Machines Company, against the American Can Company. Decree for complainants.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

T. Ludlow Chrystie, of New York City, Arnold Wainwright, of Montreal, Canada, and Francis K. Raynor, of New York City, for plaintiff Agency of Canadian Car & Foundry Co., Limited.

Walter C. Noyes, of New York City, and H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, for plaintiff Recording & Computing Machines Co.

Philip G. Bartlett, Julius F. Workum, and Graham Sumner, all of New York City, for defendant.

The parties will be referred to as "Agency Co.," "Recording Co.," and "Can Co."

MAYER, District Judge. The suit is to recover $1,500,000 with interest. Defendant concedes, and always has conceded, that it owes $1,500,000 to somebody; but, because of certain transactions and documents, defendant's position is that it cannot safely pay the money to plaintiffs, and that it may hereafter be subject to a judgment or decree in some suit or action which may be brought by some "Russian government."

Two principal propositions are relied upon by plaintiffs:

(1) That under the documents and transactions in the case the Russian government has not any beneficial interest in the money due from defendant, and therefore that plaintiffs alone are entitled thereto.

(2) That if any beneficial interest in the $1,500,000 existed in favor of the Russian government, a release and assignment executed by authorized representatives of the Russian government disposed of and discharged such beneficial interest. If the plaintiffs prevail, there arises the question of what interest, if any, is due to the respective plaintiffs, i. e., the date from which interest should run and the rate. There is also a minor subsidiary controversy between Can Co. and Recording Co. which was referred to a special master. The master has submitted a clear and concise report in respect of the matter before him. His report is confirmed, and further reference thereto is unnecessary.

1. The basis of the indebtedness owing by Can Co. is the manufacture and delivery of fuses by Recording Co. The liability of Can Co. to pay for fuses manufactured by Recording Co. arose under two agreements dated, respectively, August 23, 1916, and November 21, 1916, the details of which need not be recited. The net result was that Recording Co. manufactured 1,500,000 time fuses which were delivered and accepted. Recording Co., however, was indebted to Agency Co., and Agency Co. had large contracts with the Russian government for the manufacture of munitions.

On October 31, 1916, an arrangement was entered into by Can Co., Recording Co., and Agency Co. which was expressed in the following letter:

"October 31, 1916.

"American Can Company, 120 Broadway, New York City—Dear Sirs: In consideration of your making advances to Recording & Computing Machines Company of the sums provided in your contract, dated August 23, 1916, with that company for the manufacture of 1,250,000 Russian time fuses, and of

your making the payments to that company of the purchase price of time fuses, as provided in said contract, out of which the sum of one dollar ($1.00) of the purchase price of each fuse delivered shall be paid by you to us, until all sums which may now or hereafter be due from and payable by that company to us are adjusted and paid or otherwise satisfied:

"We hereby agree that you may take security for such advances on all materials purchased by that company from the sums so advanced, and that we will waive any claim or lien which we may have upon the time fuses manufactured for you by that company under its said contract with you, and that we will not interfere with the delivery to you by that company of the time fuses so manufactured for you by that company under its said contract with you. * * *

"Yours very truly,
"Agency of Canadian Car & Foundry Company,
"C. H. Cahan, Chairman of the Board of Directors.

"Accepted by:
"American Can Company,
"J. R. Harbeck, Vice President.

"Accepted by:
"Recording & Computing Machines Company,
"H. A. Toulmin, Vice President."

The above is the document of primary importance in the case.

On January 2, 1917, an agreement (too long to quote) was entered into between "General A. Zalubovsky, President of the Imperial Russian Supply Committee in America, Acting for and on Behalf of the Chief Artillery Board of the Imperial Russian Government," and Agency Co. The instrument was signed, "For Lieutenant General A. Zalubovsky, President of the Imperial Russian Supply Committee in America, by Major General Khrabroff, Vice President." By this agreement, inter alia, Agency Co. assigned to the Russian government the agreement or order of October 31, 1916, supra, "to receive from American Can Company all sums of money payable to the Agency Company under the terms of said agreement," and the Russian government agreed to make certain payments to Agency Co.

Contemporaneously with the agreement of January 2, 1917, there was indorsed on the order of October 31, 1916, the following:

"New York City, January 2, 1917.

"For valuable consideration, Agency of Canadian Car & Foundry Company, limited, hereby assigns to the Imperial Russian Government, all the right, title and interest of said company in and to all sums of money payable under the within agreement, dated October 31, 1916.

"Agency of Canadian Car & Foundry Company,
"By C. H. Cahan,
"Chairman of Board of Directors.   [Seal.]"

As part of the transaction of January 2, 1917, Recording Co. on January 11, 1917, entered into an agreement with the Russian government (acting through the same officials) that contractors with Recording Co. for time fuses (which included defendant) should deduct $1 from the purchase price of each fuse and pay the same to the Russian government until payment should be made in full of the amount which the Russian government was required to pay to Agency Co. under the agreement of January 2, 1917.

On September 14, 1917, Can Co. agreed with Recording Co. that Can Co. retain $1,500,000 "for account of Agency of Canadian Car and

Foundry Company or the Imperial Russian government, as their interests may appear" until such time as there was a final adjustment of account between the interested parties or a final determination by law.

Certain differences having arisen, the details of which may be passed by, matters were finally settled between Recording Co., Agency Co., and the Russian government acting through Gen. Khrabroff, now president of the Russian Supply Committee, and the settlement was expressed in elaborate detail in an agreement dated December 18, 1917, and executed by the three parties. On the same day, and as a part of the same transaction, the Russian government, acting through Gen. Khrabroff as "President of the Russian Supply Committee in Behalf of the Russian Government" assigned to Agency Co. and Recording Co. all its right, title, and interest, if any, to the $1,500,000 held by Can Co. Under date of December 19, 1917, Gen. Khrabroff, as president of the Russian Supply Committee in America, also executed and delivered a general release to Recording Co. By an agreement dated December 22, 1917, Recording Co. and Agency Co. stated and adjusted their accounts as between themselves; the amount due Agency Co. out of the $1,500,000 being fixed at $713,176.07.

From the foregoing outline of the essential facts and an examination of the documents, it is clear beyond question that the Russian government has not any beneficial interest in the money held by Can Co. Even if Gen. Khrabroff lacked authority to sign on behalf of the Russian government, that government could not successfully maintain in any court in this country any suit or action against Can Co. for the $1,500,000, or any part thereof, once Recording Co. and Agency Co. had settled their differences.

2. It would be unnecessary to go further, but for the fact that defendant expresses the fear that in some jurisdiction—possibly foreign—it may be held that under the documents the Russian government has a beneficial interest, and that this it has never relinquished because of lack of proof that Gen. Khrabroff had authority to bind the then existing Russian government by his signature to the settlement agreement of December 18, 1917.

The contention, in effect, is that the Russian Supply Committee originally acted for the Imperial Russian government, of which the Czar was head; that that government has fallen and other governments have followed, and, as a result, the Russian Supply Committee no longer had authority; and that proof is wholly lacking as to the powers or status of Gen. Khrabroff.

[1] The attempt was made to offer lay proof as to who were, at present, in control of the Russian government, or, in other words, who or what the present government of Russia is. This line of testimony was excluded upon the well-settled principle that the question of sovereignty is a political question, the determinaton of which by the political branch or branches of our government, i. e., executive and/or legislative departments, binds the judicial department. Jones v. United States, 137 U. S. 202, 212, 11 Sup. Ct. 80, 34 L. Ed. 691; Pearcy v. Stranahan, 205 U. S. 257, 265, 27 Sup. Ct. 545, 51

L. Ed. 793; Williams v. Suffolk Ins. Co., 13 Pet. 415, 419, 10 L. Ed. 226; The Hornet, Fed. Cas. No. 6705; Kennett v. Chambers, 55 U. S. (14 How.) 38, 14 L. Ed. 316; Phillips v. Payne, 92 U. S. 130, 23 L. Ed. 649; Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726; Ricaud v. American Metal Co., 246 U. S. 304, 38 Sup. Ct. 312, 62 L. Ed. 733.

After the date of the beginning of the transactions and before the settlement in December, 1917, the United States had recognized the Russian government which succeeded that of the Czar. In response to a letter of inquiry by one of the counsel for defendant, Mr. Polk, the counselor to the Department of State, replied:

"I find that this government instructed the American Ambassador, under date of March 20, 1917, to recognize the new government of Russia and to state to the proper Russian authorities that the United States will be pleased to continue intercourse with Russia through the medium of the new government."

Shortly thereafter, viz. on July 5, 1917, Boris Bakhmetieff was recognized as the Russian Ambassador, and that recognition still continues, as evidenced by the following certificate of our Secretary of State:

"To All Whom These Presents Shall Come, Greeting:

"Know ye that I, Robert Lansing, Secretary of State of the United States of America, do hereby certify that Boris Bakhmetieff presented his letter of credence to the President of the United States and was officially received by the President as Ambassador Extraordinary and Plenipotentiary of Russia on the fifth day of July, 1917; and that the said Boris Bakhmetieff has accordingly since that date been recognized by the Department of State as Ambassador of Russia and as entitled to all the rights, privileges and immunities of such status.

"In witness whereof, I have hereunto subscribed my name and caused the Seal of the Department of State to be affixed.

"Done in the city of Washington this eighth day of May, one thousand nine hundred and eighteen.        Robert Lansing.  [Seal.]"

This certificate is controlling upon the courts (In re Baiz, 135 U. S. 405, 10 Sup. Ct. 854, 34 L. Ed. 222; Jones v. United States, 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691), and is preliminary to a certificate from Ambassador Bakhmetieff in connection with this suit.

What happened was that Mr. Murray, of Coudert Bros., attorneys for the Russian government, informed the Russian Ambassador of the pendency of this litigation and of a request made of him (Murray) to testify and he asked for the Ambassador's instructions. As a result of this inquiry, Mr. Murray did testify and produced at the trial a certificate of the Russian Ambassador, setting forth the personnel of the Russian Supply Committee, and certifying:

"That the Russian Supply Committee in the United States was organized in October, 1915, for the purpose of purchasing supplies in the United States for Russia, accepting supplies purchased or manufactured in the United States for Russia, and settling all matters relating to contracts for supplies purchased or manufactured in the said United States for Russia; that said committee's authority continued until the first day of March, 1918; that the said committee had full charge of all matters pertaining to the two contracts between Russia and Canadian Car & Foundry Company, Ltd., for 5,000,000

rounds of ammunition, also all the relations between Russia and Agency of Canadian Car & Foundry Company, Ltd., arising from the assignment by Canadian Car & Foundry Company to Agency of Canadian Car & Foundry Company of the contracts for 5,000,000 rounds of ammunition, also of all relations with the Recording & Computing Machines Company of Dayton, Ohio, which company was engaged in the manufacture of Russian time fuses; that the said committee had full power and authority between the date of its organization and the first day of March, 1918, to liquidate and close all accounts with Agency of Canadian Car & Foundry Company, Ltd., Canadian Car & Foundry Company, Ltd., and the Recording & Computing Machines Company."

[2] An ambassador, of course, is not subject to process in a foreign court, and there are, perhaps, some matters in respect of which an ambassador's certificate might not be admissible; but, when he certifies to the law of his country or to the personnel and authority of officials of his government, such certificate is clearly admissible as proof of the facts therein set forth.   In the Goods of Klingerman, 3 Sw. & Tr. 18; In the Goods of Anne Downey, 3 Hagg. Ecc. Rep. 767; Goods of Prince Oldenburg, L. R. 9 Prob. Div. 234;  The Republic of Mexico v. De Arangoiz, 12 N. Y. Super. Ct. 643, 646.   See, also, Wigmore, vol. 2, p. 1820 et seq., §§ 1455, 1456; Chamberlayne, vol. 4, p. 3805 et seq., §§ 2769–2775; 16 Cyc. 1217.

The change in the form of Russian government and the fact that in the original papers that government was described as the "Imperial Russian Government," while the settlement papers are executed on behalf of the "Russian Government," are matters of no significance.

[3] Since the notable precedent of The Sapphire, 78 U. S. (11 Wall.) 164, 20 L. Ed. 127, the principle is firmly established in our courts that the rights and liabilities of a state are unaffected by a change either in the form or personnel of its government, however accomplished, whether by revolution or otherwise.   No other doctrine is thinkable, at least among nations which have any conception of international honor.   See, also, United States of America v. McRea, L. R. 8 Eq. 69; John Bassett Moore's Digest of International Law, vol. 1, p. 249, and also 251, quoting Secretary Bayard's instructions to the then American Minister to Peru (September 23, 1886).

Other grounds could be stated which, so far as concerns the Russian government, fully support the validity of the settlement of December, 1917; but enough has been pointed out to demonstrate that there is no occasion for further timidity on the part of defendant.

It may, however, be added that the officially responsible character of the Russian Supply Committee as evidenced by the many and, in money, enormous transactions confided to it throughout all the dates relevant to this controversy, should assure defendant that no tribunal in this country will ever subject defendant to a second payment—and we have no concern with remote possibilities as to the action of any foreign tribunal.

[4] It may be further added, in passing, that some cables from Russia were received in evidence, where the proof, because of war conditions, was not in accordance with what defendant regarded as orthodox methods of proving communications of this kind.   As I under-

stand, the modern method permits the trier of the facts to determine whether as matter of fact the paper is genuine and was sent as indicated. War exigencies require that the courts shall deal with such situations in a sensible way, not too much fettered by inelastic rules, while at the same time safeguarding against the reception in evidence of fabricated communications.

For the reasons outlined, plaintiffs are entitled to recover.

3. In respect of interest to be allowed, the case should be disposed by the intent of the parties as gathered from the documents and by the situations which developed.

As to the Recording Co.:

Under the agreement of September 14, 1917, Can Co. was required to allow interest from November 1, 1917, at the rate of 2 per cent. per annum "to the date of payment of the amount" or such other rate as the Can Co. would receive from its bankers. Meanwhile Can Co. was to hold the money until Recording Co., Agency Co., and the Russian government arrived at a "final settlement and adjustment of account * * * or until their interests shall be finally determined by law"; "their interests" meaning the interests of the Can Co., Agency Co., and Russian government.

On December 7, 1917, counsel for defendant wrote counsel for Recording Co. that defendant had concluded not to pay the $1,500,000 except "pursuant to the judgment of a court." Under the agreement of September 14, 1917, it was the duty of Can Co. to pay on demand, as soon as it was credibly informed that the parties had "arrived at a final settlement."

Such information was conveyed to Can Co. by a letter of the attorney for Agency Co., dated December 28, 1917. This letter was a demand to pay Agency Co. $713,176.07 with interest and inclosed a copy of the settlement agreement of December 22, 1917, between Agency Co. and Recording Co. and also a copy of the assignment of December 18, 1917, by the Russian Supply Committee to Agency Co. and Recording Co., of all right, title, and interest in and to the $1,500,000.

As defendant had theretofore refused to pay without a lawsuit, further demand was unnecessary, and Recording Co. is entitled to interest at the rate of 6 per cent. per annum from December 28, 1917, and at 2 per cent. per annum (no greater sum having been received from defendant's bankers) from November 1, 1917, to December 28, 1917.

As to Agency Co.:

Agency Co., under the agreement of December 22, 1917, is entitled to half the interest from November 1, 1917, to December 28, 1917, which Can Co. is to pay Recording Co.

Nothwithstanding the argument earnestly pressed by counsel for Agency Co., it seems to me that interest was not payable to Agency Co. until after the December settlement and the Agency Co.'s demand on December 28, 1917. From that date Agency Co. is entitled to interest from Can Co. on its $713,176.07 at the rate of 6 per cent. per annum.

Submit decree in accordance herewith.

Settle decree on three days' notice. As to costs: Plaintiffs may have one bill of costs, the interadjustment of which should be taken care of in decree. Recording Co. will pay all the taxable costs of the reference.

I note appreciation of the aid of counsel in submitting very helpful briefs, and I am further obliged to Mr. Chrystie for the convenient form in which many of the important exhibits were printed.