MOORE *v.* McGUIRE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 222.  Argued March 1, 4, 1907.—Decided March 25, 1907.

Where the bill is brought in the Circuit Court to quiet, and remove a cloud upon, the title of land alleged to be within the State and District where the suit is brought, and the cloud is based upon tax sales made under the authority of an adjoining State in which defendants claim the land is situated, although the chief difference may be upon the question of fact as to the location of the boundary line between the two States, if the construction of the act of Congress admitting one of the States to the Union and defining its boundaries is also in dispute the Circuit Court has jurisdiction of the case as one arising under the Constitution or laws of the United States. *Joy* v. *St. Louis,* 201 U. S. 332, distinguished. Under the acts of Congress of March 1, 1817, 3 Stat. 348, admitting Mis-

sissippi, and of June 15, 1836, 5 Stat. 50, admitting Arkansas to the Union, the boundary line between the two States is the middle of the main channel of the Mississippi River as it was in 1817, and at the point where Island No. 76 is situated it was at that time on the Mississippi side of that island which has never been within the State of Mississippi, notwithstanding attempts on the part of that State to exercise jurisdiction thereover.

In this case the court determined a controversy between private parties involving the location of the boundary line between two States favorably to the party in possession of the land involved under the authority of the State actually exercising jurisdiction thereover, but expressed doubt as to whether courts should in such a case go further than the actual conditions rather than leave it to the other State, if dissatisfied, to bring a suit in its own name.

142 Fed. Rep. 787, reversed.

THE facts are stated in the opinion.

*Mr. D. E. Myers* and *Mr. U. M. Rose,* with whom *Mr. W. E. Hemingway* and *Mr. G. B. Rose* were on the brief, for appellants:

The boundary line between the States is the thread of the Mississippi River. If the western boundary of the Mississippi was at the time of her admission into the Union the eastern shore of the river, as the act of admission would seem to have intended, the act of admission of Arkansas, making her eastern line the thread of the river, had the effect to amend the former act so as to make the line identical for both States. "Where territories are coterminous they must have a common boundary." *Coffee* v. *Groover,* 123 U. S. 22.

This line is not changed by any later displacements of the main navigable channel of the river. *Missouri* v. *Nebraska,* 196 U. S. 23; *Nebraska* v. *Iowa,* 143 U. S. 360; *Indiana* v. *Kentucky,* 136 U. S. 508.

There is no one living now who knows personally where the main channel of the river at Island 76 was in 1817. It is equally impossible to establish the fact by general reputation, which has passed away with the generation that formed it. Nothing then, is left but tradition; and that is the best evidence because it is the only evidence. *Ellicott* v. *Pearl,* 10 Pet. 435.

Evidence of tradition is admissible in cases of this kind. "Repute," "reputation" and "tradition" are used convertibly in this kind of case. 28 Am. & Eng. Enc. Law, 2d ed. 443, note 7. See also 1 Elliott Ev., §§ 402–403.

Courts have always been liberal in receiving evidence with regard to boundaries which would not be strictly competent in the establishment of other facts. Old surveys, perambulations of boundaries, even reputation, are constantly received on the question of boundaries of large tracts of land. *Ayers* v. *Watson,* 137 U. S. 596; *Orton* v. *Smith,* 18 How. 266; *Hart* v. *Sansom,* 110 U. S. 155; *Boardman* v. *Reed,* 6 Pet. 341; *Beard* v. *Talbott,* Cook (Tenn.) (Cooper's ed.), 142.

On the whole testimony the court below found "that the evidence conclusively establishes the fact that ever since 1839, and probably two or three years before that time, up to the year 1881, the main channel was east of the island."

The effect and construction of a United States land patent must, in the very nature of the subject, be a question for the United States courts to determine for themselves, without reference to the rules of construction adopted by the States for their grants. *Scranton* v. *Wheeler,* 57 Fed. Rep. 811.

The question as to boundaries between the States is not governed by the local law. *Martin* v. *Waddell,* 16 Pet. 367.

The decision of the Land Department that lands are swamp and overflowed lands is final and conclusive. *Rogers Locomotive Works* v. *Emigrant Co.,* 164 U. S. 560; *Heath* v. *Wallace,* 138 U. S. 573; *Wright* v. *Rosebery,* 121 U. S. 509.

A patent is the highest evidence of title, and is conclusive as against the Government, and all claiming under junior patents or titles until it is set aside or annulled by some judicial tribunal in a direct proceeding for that purpose. *Moore* v. *Robins,* 96 U. S. 533.

With the patent passes away all authority or control of the executive department over the land, and over the title which it has conveyed. *Noble* v. *Union River Logging Ry.,* 147 U. S. 175; *Hardin* v. *Jordan,* 140 U. S. 400.

The letters of the United States Land Officers embraced in the transcript are wholly irrelevant, except as showing that the State of Mississippi years ago was fully advised of the situation from a legal point of view as affecting the questions of acquiescence and prescription.

As no patent has ever issued from the United States to the State of Mississippi, the defendants are not in a position to contest the title of the plaintiffs. *Stringer* v. *Young*, 3 Pet. 337; *Chotard* v. *Pope*, 12 Wheat. 590; *Carroll* v. *Safford*, 3 How. 461.

There is no charge of fraud or unfairness. *Lytle* v. *Arkansas*, 9 How. 335.

The Swamp Land Act of September 28, 1850, only granted lands "which shall remain unsold at the passage of this act." The defendants have no standing in court unless they can show a prior right. *Schaer* v. *Gliston*, 24 Arkansas, 137; *Holland* v. *Moon*, 39 Arkansas, 120; *Miller* v. *Gibbons*, 34 Arkansas, 213; *Dewees* v. *Reinhardt*, 165 U. S. 392.

A mere intruder without title cannot attack the judgment of the Land Department. *Ehrhardt* v. *Hogaboom*, 115 U. S. 69; *Bates* v. *Railway Co.*, 1 Black, 208.

Defendants show no interest in the lands whatever. The State of Mississippi could only acquire title by patent; and as a patent has already issued no patent can ever be issued to that State. *Rogers Works* v. *Emigrant Co.*, 164 U. S. 570.

*Mr. J. M. Moore*, with whom *Mr. Alexander Y. Scott*, *Mr. Charles Scott* and *Mr. E. H. Woods* were on the brief, for appellee:

Usucaption and prescription as generally asserted is not a positive rule of international law, whereby one nation can acquire territory of right belonging to another; said rule is merely a rule of evidence aiding in the construction of treaties or the ascertainment of the true and ancient boundary.

The Act of Congress admitting Mississippi into the Union, made the middle channel of the Mississippi River the western boundary of the State of Mississippi.

In 1817, the date Mississippi was admitted into the Union, the main channel of the Mississippi River ran west of Island 76.

Even in case the court should hold the western boundary of Mississippi to be the eastern bank of the Mississippi River, the boundary of Mississippi would extend to the eastern bank of the main channel of said river for navigation purposes and hence to the western bank of Island 76, including said Island within the territorial jurisdiction of Mississippi.

Arkansas never had such possession of Island 76 and never exercised such jurisdiction over the territory of said island as to warrant the invoking of the pretended doctrine of usucaption.

Mississippi never abandoned or relinquished its possession so that the so-called doctrine of prescription could be invoked against her; but on the contrary, she has held possession of said island from 1817 to the present date; and Arkansas has not claimed possession for a sufficient length of time to obtain title under the pretended doctrine of usucaption and prescription.

The act of an executive officer, or officers within the State, cannot transfer title to property within the territorial jurisdiction of the Nation or State or change or affect the boundary of said State.

The Land Department of the United States cannot change the boundaries between two States by the mere ministerial act of offering the land for sale, erroneously as within one or the other of the States.

The sovereign right of taxation belonging to a State is not defeated by the Federal Government patenting land within its territorial jurisdiction to a citizen of the State or of a foreign State.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill to quiet and remove a cloud upon the title to land alleged to be in Arkansas. The Circuit Court found that

the land was in Mississippi and dismissed the case for want of jurisdiction. 142 Fed. Rep. 787. The judge made the usual certificate, and an appeal was taken to this court.

The land in controversy is Island No. 76, formerly called Chapeau Island, in the Mississippi River, and whether it is part of Arkansas or of Mississippi depends, as both parties agree, on what was the western boundary of Mississippi, as established by the Act of Congress admitting that State to the Union. Act of March 1, 1817, c. 23, 3 Stat. 348. In that Act the State is bounded by a line "beginning on the river Mississippi" and running around the State· "to the Mississippi river, thence up the same to the beginning." The plaintiffs contend that these words should be construed to bound the State on the eastern bank of the river, while the defendants maintain that they refer to the middle of the main channel, as it then was. The chief difference is upon the question of fact whether the main channel was to the east or west of the island in 1817, but as the construction of the statute also is in dispute, there is jurisdiction, and *Joy* v. *St. Louis*, 201 U. S. 332, cited by the appellees, does not apply.

We shall assume for the purposes of decision that the boundary is the middle of the main channel as it was in 1817, and address ourselves at once to the chief issue. Some facts are clear. Arkansas was admitted to the Union by Act of Congress of June 15, 1836, c. 100, 5 Stat. 50. This Act purported, in terms, to bound the new State by the middle of the main channel; that is, of course, as it then was, so that if at that time the channel was on the Mississippi side, the act of the Government imported an understanding that the boundary of Mississippi went no farther. In 1847, 1848 and 1849 there were purchases of a great part of the island at the United States Land Office in Helena, Arkansas, and certificates and patents were issued by the United States Government. The titles thus created are not attacked, but are said to have been lost by the Mississippi tax sale hereafter mentioned. The small remnant was conveyed by the United States to Arkansas

ten years later by a patent under the Swamp Land Act. Arkansas regularly taxed the island as far back as its books are preserved, and presumably before. The above mentioned greater part was forfeited for taxes to the State. Then the State instituted a statutory proceeding to decide whether the forfeiture was valid, and, if not, to collect the taxes by a new sale. A new sale was ordered in due time, made, and the deed approved by the court. The plaintiffs are purchasers from the grantor under this sale and also from grantees of the residue patented under the Swamp Land Act to the State.

Thus it is apparent that Arkansas has exercised dominion over the island from 1847 down to recent times. The State of Mississippi, on the other hand, only recently and since the channel has changed, as we shall state, has attempted to tax it. In 1891, it purported to sell the land for taxes, but the next year the money paid was refunded to the purchaser, on the certificate of the Governor and Attorney General of the State that the land was "within the limits and the property of the State of Arkansas." Later, in 1899, the State changed its mind and sold the land for taxes again, the defendants getting their title from this sale, but the possession of Arkansas and the plaintiffs under it has remained. In view of these conditions there may be a doubt whether courts should go beyond them in a private controversy, rather than leave it to the State of Mississippi, if dissatisfied, to bring a suit in its own name. See *Jones* v. *United States*, 137 U. S. 202; *Foster* v. *Neilson*, 2 Pet. 253; *Filhiol* v. *Torney*, 194 U. S. 356; *Bedel* v. *Loomis*, 11 N. H. 9; *State* v. *Dunwell*, 3 R. I. 127; *State* v. *Wagner*, 61 Maine, 178, 184. But, however this may be, the facts stated give us a starting point and raise a presumption which is fortified by some further matters also beyond dispute.

The court below finds that "ever since 1839, and probably two or three years before that time, up to the year 1881, the main channel was east of the island in controversy, and since 1881, up to the present time west of the island;" the change

being due, it seems to the washing away of the old Napoleon Island, ten miles or so above.  There is no serious attempt to cast doubt upon this finding and we deem it correct.  In connection with the finding it should be noticed that a Mississippi statute of 1839, repeated in the Code of 1857, p. 64, gives as one boundary of Bolivar County, "thence down the main channel of the said Mississippi," thus seemingly adopting the channel as it then was, on the Mississippi side, as the true boundary, and furnishing evidence from which we should not lightly depart.  In 1849, the island was surveyed and platted as part of Arkansas, and the survey was certified by William Pelham, the Surveyor of Public Lands in Arkansas. The field notes state that the main channel is on the Mississippi side, and that the inhabitants of the island vote and pay taxes in Arkansas.  They add that the channel or chute on the other side is wide, but in low water very shallow, and that on December 27, 1845, the surveyor got his skiff through with difficulty.  This is the most exact and authentic of the surveys produced on either side.

The presumption raised by the facts thus far recited is confirmed by the evidence of an old steamboat captain, whose personal experience went back to 1839.  He testified that he learned under his father and brother, and that they instructed him that the channel was on the east side in 1812. He further stated that one of the first wood yards established on the Mississippi River for selling wood to steamers was just above No. 76 on the Mississippi side.  Another witness, who lived in the neighborhood in 1839 and after, testified that the channel was considered to be on the east side, that the boats passed directly in front of her house and that they could not pass up the chute on the other side, except in very high water.  Having in mind the finding that we have quoted we mention the last testimony only for the indication that it gives of a more or less permanent condition existing at the time when the witness's memory began.

As against this consensus of action on the part of the two

States concerned and the United States, this presumption from the establishment of the channel for a time running back nearly or quite to the admission of Arkansas, and this testimony from memory and tradition, the chief reliance of the defendants is upon certain maps and the statement in a letter to which we shall refer. The first and most important of the maps is one of a "Reconnoissance of the Mississippi and Ohio Rivers," made during the months of October, November and December, 1821, by two captains and a lieutenant of engineers under the direction of the board of engineers. This exhibits Chapeau Island with a dry sand bar on the Mississippi side, and indicates by dots that the channel is to the west. If the distances are accurate the sand bar at the top approaches pretty near to Mississippi; but in view of the small scale of the map and the absence of measurements there is no sufficient warrant for assuming that the distances are accurate. As to the indication of the channel, it would not be surprising, considering the short time during which the reconnoitre extended, if it had been determined by nothing more than the visible width. But in any event it hardly would do more than confirm a conjecture suggested by other sources which we shall mention, that in some years the western passage was as good as or better than the more permanent one to the east.

The next map is one certified January 22, 1829, of a survey in February, 1827, showing the Arkansas shore sectionized and the island sketched in, with distances indicated at some points, but not sectionized. This map cannot be said to help either side except by speculation of an uncertain sort. The next map, however, is more definite. It is a map of Township 21, Range 8 west, Mississippi, said to be projected from field notes of Benjamin Griffin, also produced, made in January and February, 1830. Here the island is divided up as part of the township, although not sectionized under the United States statutes, and there are other slight indications that the draughtsman regarded the island as belonging to Mis-

sissippi. This map is more or less counteracted by another map of the same township signed by Benjamin Griffin, which does not sectionize the island and indicates, if it indicates anything about it, that the channel is on the east side. The field notes in two places speak of "where the west boundary comes to the river," and they give the width of the east channel at the top as 2,920 feet. The defendants contend that the first mentioned of these two maps is the completed work, but that hardly can be said to be proved.

In addition to these maps there is some correspondence, etc., from which it appears that the island was selected by Mississippi under the Swamp Land Act, and that after the selection had been approved by the Secretary of the Interior, but before any patent had issued, the island was sold by the State in 1854 to one Ford. In 1859, Ford wrote to the Governor of Mississippi complaining that Arkansas claimed jurisdiction and that the island had been disposed of as public domain within the limits of that State, asking the Governor to claim a patent from Washington and enclosing a letter to the writer, Ford, from one Downing, who is said to have been Surveyor General of Mississippi at an earlier date. This letter is much relied upon. It purports to answer an inquiry as to the island, refers to the survey of 1830 or 1831 and says that at that time, and for some years after, the Island Chute, as it was called, was quite narrow, not over one hundred yards wide about opposite the middle of the island, and that at that time the writer never heard of a steamboat going up or down on the east side. The main river then passed on the west side. The writer adds that he thinks it was in 1835 that he spent some time in examining the land in T. 21, R. 8 W., and that the Island Chute was quite narrow then.

Presumably this letter was written with knowledge of Ford's object, and it hardly can be said to stand on the footing of disinterested tradition. Whether it was admissible or not we need not consider. It was forwarded to the Department of the Interior by the Governor with Ford's claim. The

Commissioner answered the letter, expressing an opinion favorable to Mississippi from inspection of the plats and Downing's statement, and enclosing a similar opinion of a former Commissioner in 1855, also from inspection of the plats. Both letters, however, called for evidence of the condition in 1817, and the later one specifically asked for an affidavit from Downing and another disinterested witness. It was assumed that the land, or most of it, was disposed of, and that the question would be of reimbursement. The affidavits asked for seem not to have been furnished, and nothing more appears to have been done until June 27, 1896. At that date another letter from the Acting Commissioner speaks of the land as having been mostly disposed of before the Swamp Land Act and therefore not granted by it, and suggests the submission of a list containing the 51 acres not so disposed of for approval to Mississippi, giving the Governor sixty days for action. Nothing further was done.

This evidence appears to us insufficient to meet the established facts to which we have referred. It must be admitted to raise a doubt whether the channel has not varied from time to time before the great changes about 1881. This doubt is enhanced by other sources of information not put in evidence but partially referred to by the plaintiffs at the argument. A map in Samuel Cumming's Western Navigator, Philadelphia, 1822, vol. 1, indicates the channel on the Arkansas side, and this is confirmed by the text. Vol. 2, p. 44. In the Navigator, Zadok Cramer, published for a number of years at Pittsburgh for the information of pilots, in 1806 the channel is said to be good on both sides. In 1808 and 1811 it is said that the left (east) side is the best in low water. In 1814, 1817 and 1818, on the other hand, the best channel is said to be on the right side at all stages. We refer to all the years that we have seen. In view of this statement for the very year when Mississippi was admitted, it is impossible not to hesitate, but in Cumming's Western Pilot for 1833 we read "channel either side: the right is nearest, and the left

is probably rather deepest," and this seems to us to have been true for the whole time. Upon the whole evidence we are compelled to decide that the plaintiffs have made out their case.

*Decree reversed.*

Mr. Justice Harlan agrees with the Circuit Court as to both the facts and the law, and therefore dissents.

Mr. Justice Peckham took no part in the decision.