# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERTO MONCADA,

*Plaintiff-Appellant*,

v.

MARCO A. RUBIO, in his official capacity as U.S. Secretary of State,

*Defendant-Appellee*.

No. 23-55803

D.C. No.
2:19-cv-01293-
AB-AGR

OPINION

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted November 21, 2024
Pasadena, California

Filed August 20, 2025

Before: Johnnie B. Rawlinson, Morgan Christen, and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Johnstone

# SUMMARY[*]

## Birthright Citizenship / Diplomatic Immunity

The panel affirmed the district court's judgment denying Roberto Moncada's claim to United States birthright citizenship.

Moncada was born in New York City in July 1950, when his father, a Nicaraguan national, was working for Nicaragua's permanent mission to the United Nations. For nearly seventy years, Moncada lived and worked in the United States as an American citizen. Five times he subscribed the oath of allegiance, and five times the government issued him a passport. In 2018, however, the government revoked his passport, telling him he did not acquire birthright citizenship because his father held diplomatic immunity when Moncada was born.

The Fourteenth Amendment provides: "All persons born . . . in the United States, and subject to the jurisdiction thereof, are Citizens of the United States." Moncada's claim depended on whether he was born "subject to the jurisdiction" of the United States, or instead was immune from such jurisdiction due to his father's position. Looking to federal and international law, the panel explained that the question turned on whether President Truman received Moncada's father as an attaché, or whether he served as a consul. If Moncada's father was an attaché, then the father and his family held full diplomatic immunity – meaning they were not subject to the jurisdiction of the United States, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Moncada was not a birthright citizen. If the father was a consul, then he held immunity only for official acts – meaning that he and his family were subject to the jurisdiction of the United States, and Moncada was a birthright citizen.

In the district court, the Secretary of State produced a recently executed certification of Moncada's diplomatic immunity at birth, arguing it was conclusive and binding evidence of Moncada's lack of birthright citizenship. The district court declined to recognize the Certificate as conclusive, but still, based on the record, held that the Secretary established by clear and convincing evidence that Moncada was not born a citizen.

The panel explained that the President's reception of a person as a diplomat is conclusive under Article II. But whether the President has, in fact, received a diplomat such that the diplomat's children are not entitled to birthright citizenship is a question about the Fourteenth Amendment that the Constitution and Congress has charged the courts with answering.

The panel agreed with the district court that the certificate was not conclusive evidence of Moncado's non-citizenship, explaining that while a certificate may be important evidence for courts to consider in making a factual determination of whether the President received a person as a diplomat, it is not conclusive to the exclusion of conflicting evidence of that fact. Just as the Supreme Court has done in similar cases, the panel considered the Certificate in the context of a broader record of executive branch documents.

The panel reviewed the conflicting evidence in the record and concluded that the district court did not clearly

err in finding that Moncada's father held diplomatic immunity when Moncada was born.

Noting that the district court found it "impossible to conclude that this is justice," the panel stated that it shared that concern, but explained that, as inequitable as this result is, courts lack the equitable power to remedy the government's errors by granting Moncada citizenship.

---

## COUNSEL

Sanjay Sobti (argued), U.S. Law Center, Corona, California, for Plaintiff-Appellant.

Ruth A. Mueller (argued), Trial Attorney; Alexander Halaska, Acting Assistant Director; William C. Peachey, Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

**OPINION**

JOHNSTONE, Circuit Judge:

Roberto Moncada was born in New York City in July 1950. His father, a Nicaraguan national, worked for Nicaragua's permanent mission to the United Nations. For nearly seventy years, Moncada lived and worked in the United States as an American citizen. Five times he subscribed the oath of allegiance, and five times the government issued Moncada a passport. In the district court's words: "A child was born in America and told by the United States government—his government—that he was an American citizen. And . . . it told him this again and again and again and again." The government repeatedly affirmed that Moncada's father's apparent status as a Nicaraguan consul did not confer diplomatic immunity on his children. So, the government explained, Moncada was born "subject to the jurisdiction" of the United States according to the Fourteenth Amendment. U.S. Const. amend. XIV, § 1. And under the Constitution, citizenship was his birthright.

But the government was, as the district court put it, "wrong all along." In 2018, the government reviewed its records and found that Moncada's father served as an attaché, not a consul, when Moncada was born. Unlike a consul, an attaché and his family possess full diplomatic immunity. So, the government now asserted, Moncada was not born "subject to the jurisdiction" of the United States. Therefore, he was not a birthright citizen. The government revoked Moncada's passport and told him he "did not acquire U.S. citizenship by virtue of [his] birth here."

Moncada sued for a declaratory judgment that he is a citizen. The Secretary of State responded by producing a

recently executed certification of Moncada's diplomatic immunity at birth ("Certificate"). The Secretary argued that this Certificate was conclusive evidence of Moncada's lack of birthright citizenship and was therefore binding on the district court. The district court declined to recognize the Certificate as conclusive. Still, based on the underlying record of government documents, it held that the Secretary established by clear and convincing evidence that Moncada was not born a citizen because it found, as a matter of fact, that his father was an attaché with diplomatic immunity when he was born. We affirm.

## I.     The government recognized, then denied, that Moncada is a birthright citizen.

Moncada was born "subject to the jurisdiction" of the United States under the Fourteenth Amendment unless he was born with diplomatic immunity—immunity from the jurisdiction of the United States. U.S. Const. amend. XIV, § 1. Under international law principles incorporated into federal law, and subject to limited exceptions, he held diplomatic immunity if he was born into a diplomatic household. That, in turn, depends on whether the President—Truman, at the time—received Moncada's father, Dr. Moncada, as a public minister, or whether Dr. Moncada served as a consul instead. We therefore begin with the law of diplomatic immunity and the facts that determine whether Moncada held that immunity at his birth.

International law distinguishes between public ministers and consuls. Federal law reflects this distinction. The Constitution, for example, vests the President's power to "appoint Ambassadors, other public Ministers and Consuls . . . of the United States," U.S. Const. art. II, § 2, but imposes on the President a duty to receive only

"Ambassadors and other public Ministers," of foreign nations, U.S. Const. art. II, § 3. Thus, as head of state the President holds the appointment power under section 2 for all of these officers of the United States, public Ministers and consuls alike. But while the President has a corresponding constitutional duty under section 3 to receive public ministers from other nations, "the admission of Consuls into the United States, where no previous treaty has stipulated it, seems to have been no where provided for." *The Federalist* No. 42, at 280 (James Madison) (Jacob E. Cooke ed., 1961). Instead, the President's admission of consuls customarily "depends upon the stipulations of the treaties between the two states." Henry Wheaton, *Elements of International Law* 109 (1836); *see also* Vienna Convention on Consular Relations, art. 4, Apr. 24, 1963, 21 U.S.T. 77, 82 T.I.A.S. No. 6820. Public ministers and consuls represent different foreign interests in their host countries, derived from different legal authorities. As a result, they hold different forms of immunity that determine whether they and their families are "subject to the jurisdiction" of the United States.

Ambassadors and other public ministers hold full diplomatic immunity. Federal law in effect when Moncada was born voided "any writ or process [] sued forth or prosecuted . . . in any [] court[]" against "any ambassador or other public minister of any foreign prince or state, authorized and received as such by the President." An Act for the Punishment of Certain Crimes Against the United States, ch. 9, § 25, 1 Stat. 117 (1790) (codified at 22 U.S.C. §§ 252–254) (repealed 1978). This remains the law today. *See* Diplomatic Relations Act, Pub. L. No. 95-393, 92 Stat. 808 (codified at 22 U.S.C. § 254c(a)); 22 C.F.R. § 150.1(a). This is because public ministers represent a foreign sovereign and therefore require "an entire independence on

the jurisdiction and authority of the state in which [they] reside[].” Emerich de Vattel, *The Law of Nations, Or, Principles of the Law of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns* 470 (1758) (London ed., 1797). The parties agree that, for our purposes, an attaché is a class of public minister that holds diplomatic immunity. *See United States v. Benner*, 24 Fed. Cas. 1084, 1088 (C.C.E.D. Pa. 1830) (acknowledging that an attaché of the legation of the king of Denmark is an immune public minister). Under the U.N. Headquarters Agreement, representatives to the United Nations are entitled to the same diplomatic immunity the United States “accords to diplomatic envoys accredited to it.” *See* Agreement Between the U.N. and the U.S. Regarding the Headquarters of the U.N., S.J. Res. 144, 80th Cong. § 15 (1947). So an attaché of a country's delegation to the United Nations holds diplomatic immunity.

With limited exceptions not at issue here, this diplomatic immunity extends to the public minister's family. 22 U.S.C. § 252 (repealed 1978) (applying immunity to “any domestic or domestic servant of any such minister”); *see also Carrera v. Carrera*, 174 F.2d 496, 498 (D.C. Cir. 1949) (“The same immunity is not only given to an ambassador himself, but to his subordinates, family and servants as well.” (quoting 27 Harv. L. Rev. 489 (1914))). Current law also immunizes a public minister's family pursuant to the Vienna Convention on Diplomatic Relations. *See* 22 U.S.C. § 254d. That treaty, entered into force with respect to the United States in 1972, immunizes “[t]he members of the family of a diplomatic agent forming part of his household [] if they are not nationals of the receiving State.” Vienna Convention on Diplomatic Relations art. 37, April 18, 1961, 23 U.S.T. 3227. Thus, the family “of the minister, participate[s] in the

inviolability attached to his public character." Wheaton, *supra*, at 178; *see also* Vattel, *supra*, at 497 ("The respect due to the [a]mbassador extends likewise to his children, who also partake of his immunities.").

Consuls, on the other hand, hold immunity only for their official acts. *See, e.g.*, Pan American Consular Convention, Art. 17, 47 Stat. 1976, 1979 (Feb. 20, 1928) (providing, as among the United States, Nicaragua, and other countries "[i]n respect to unofficial acts, consuls are subject, in civil as well as in criminal matters, to the jurisdiction of the state where they exercise their functions."); 1 *Oppenheim's International Law* at 841 n.2 (Sir Robert Jennings & Sir Arthur Watts eds., 8th ed. 1955) (explaining diplomatic immunity does not extend to "acts which do not properly fall within the scope of the consular function"). This is because they serve their countries' citizens and commercial interests in the host country, conventionally not by right under the law of nations, but by treaty. Vattel, *supra*, at 148. "The consul is no public minister . . . , and cannot pretend to the privileges annexed to such character," though a consul should be allowed "all the liberty and safety necessary to the proper discharge of his functions." *Id.*; *see also* Wheaton, *supra*, at 181; *United States v. Ortega*, 24 U.S. 467, 469 n.a (1826) (providing that "consuls are in no respect privileged as public ministers"). So consuls "are subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state." *See Coppell v. Hall*, 74 U.S. 542, 553 (1869).

The process of Presidential reception of foreign representatives, and resulting recognition of either diplomatic or consular immunity, begins with the foreign representative's home country. For example, before a country stations a representative at the United Nations, its

mission sends a note providing the person's name, title, and nature of work. The U.N. Office of Protocol verifies the information, including the individual's duties and resulting status. That office then transmits the information to the U.S. Mission to the U.N. The U.S. Mission administers the government's duties under the U.N. Headquarters Agreement. *See* Agreement Between the U.N. and the U.S. Regarding the Headquarters of the U.N., S.J. Res. 144, 80th Cong. (1947). For each verified minister or consul, the U.N. Office of Protocol requests that the U.S. Host Country Affairs Section register that person and their family as well as their appropriate level of immunity. *See, e.g.*, 22 C.F.R. § 150.2 (effective August 28, 2024).

We do not know exactly when and how the President received Dr. Moncada as an attaché, or admitted him as a consul, because the paper trail has faded over the intervening seven decades. Ambiguities and gaps in the remaining records led to a dispute over Dr. Moncada's title and work, which determines the scope of his immunity. Moncada claims that his father served as a consul when he was born because various documents, including his birth certificate, list his father's occupation as "Deputy Consul." And in an exequatur from May 1949, President Truman recognized Dr. Moncada as "Consul of Nicaragua at New York, New York." *See* Black's Law Dictionary 716 (12th ed.) (An exequatur is "[a] written official recognition and authorization of a consular officer, issued by the government to which the officer is accredited.").

But confusingly, a July 1950 U.N. document lists Dr. Moncada as both "Consul, New York" and "Attaché." And several government records show that Dr. Moncada served as an attaché. An official August 1950 registry of diplomats from the U.S. Mission to the U.N., entitled "Members of

Delegations to the United Nations Entitled to Diplomatic Privileges" ("Blue List"), also identifies Dr. Moncada as "Attaché." Other contemporaneous records kept by the U.S. Host Country Affairs Section—including the KARDEX, its official internal registration system for tracking a diplomat's status—identify Dr. Moncada as "Attache" and list his wife and children, but not Moncada. Shortly after Moncada's birth, Dr. Moncada addressed the U.N. General Assembly in speeches concerning its budget and funding needs on behalf of Nicaragua's delegation, tasks which the Secretary says are a better fit for diplomatic rather than consular status.

Still, the government repeatedly recognized Moncada as its citizen. That is, until 2017. That's when Moncada sought to renew his passport and the government reopened its inquiry into Dr. Moncada's diplomatic status. It concluded that Dr. Moncada served as an attaché to the Permanent Mission of Nicaragua to the U.N., rather than a consul of Nicaragua, when Moncada was born. As a result, his family held diplomatic immunity. So Moncada was not, after all, a birthright citizen born "subject to the jurisdiction" of the United States. On that basis, the government revoked Moncada's passport. *See* 8 U.S.C. §§ 1104, 1185; 22 C.F.R. § 51.62(b).

Moncada sued "for a judgment declaring him to be a national" of the United States under 8 U.S.C. § 1503(a) based on his claim to birthright citizenship. At trial, James Donovan, the Minister Counselor for the Host Country Affairs Section, explained that the government repeatedly mistook Dr. Moncada's immunity status. But in trying to correct the record, the Secretary failed to produce the official U.N. request for diplomatic privileges and immunities or any contemporaneous certificate of when the President received him as a diplomat. Instead, the Secretary produced the

Certificate, dated April 14, 2020, seventy years after Dr. Moncada's arrival, that "Dr. Moncada and his family enjoyed diplomatic agent level immunity" from "April 27, 1950 . . . until March 18, 1955," including the time of Moncada's birth. The Certificate was printed on the U.S. Mission's letterhead and signed by Donovan. The Secretary asked the district court to give the Certificate conclusive weight, which the district court declined to do. On the record as whole, the district court nevertheless found that Dr. Moncada possessed full diplomatic immunity when Moncada was born, and therefore denied Moncada's claim to citizenship.

Moncada timely appealed. We review the district court's legal conclusions de novo and its factual findings for clear error. *Meza-Carmona v. Garland*, 113 F.4th 1163, 1166 (9th Cir. 2024). Under clear error review, "we must defer to the district court's findings unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Mondaca-Vega v. Lynch*, 808 F.3d 413, 426 (9th Cir. 2015) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

## II. The district court did not err in concluding that Moncada is not a citizen.

"All persons born . . . in the United States, and subject to the jurisdiction thereof, are Citizens of the United States." U.S. Const. amend. XIV, § 1 ("Citizenship Clause"); *See* Nationality Act of 1940, Pub. L. No. 76-853, § 101(b), 54 Stat. 1137, 1138 (1940) (repealed 1952) (codifying the Citizenship Clause); *cf.* 8 U.S.C. § 1401(a) (codifying the Citizenship Clause). Moncada was born in the United States, so we need only decide whether he was born "subject to the jurisdiction thereof." *Id.* When ratified, the Citizenship

Clause was understood to exclude non-citizens "who belong to the families of [a]mbassadors or foreign ministers accredited to the Government of the United States." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (Senator Jacob Howard); *see generally* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 441–42 (2020). This exclusion incorporated the longstanding international law principle of diplomatic immunity: "the immunity which all civilized nations allow to foreign ministers," and those "privileges which are essential to the dignity of [the foreign minister's] sovereign, and to the duties he is bound to perform." *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 138–39 (1812). Thus, "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers." *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); *see also Washington v. Trump*, No. 25-807, 2025 WL 2061447, at *10 (9th Cir. July 23, 2025) (explaining that "subject to the jurisdiction thereof" means "subject to the laws and authority of the United States").

The question of a foreign representative's immunity necessarily implicates the President's duty under Article II of the Constitution to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3; *see also Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 17 (2015) (explaining that "the exclusive recognition power is essential to the conduct of Presidential duties"). The executive's "action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic

courts." *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938). So when the President receives someone as a diplomat, we "are bound to accept that determination." *Id.* (citing *Jones v. United States*, 137 U.S. 202, 212 (1890)). Yet the Constitution also assigns to the federal courts jurisdiction over "all cases affecting Ambassadors, other public Ministers and Consuls," which implies a judicial power to determine whether a party is, in fact, a public minister or consul received by the President. *See* U.S. Const. art. III, § 2, cl. 1; *In re Baiz*, 135 U.S. 403, 430–31 (1890). And the Constitution vests in Congress the power to establish rules for recognizing citizenship according to Article I and the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 5; *see also id.* art. I, § 8, cl. 4 (vesting in Congress the exclusive power "[t]o establish[] a uniform Rule of Naturalization"); *cf. Fedorenko v. United States*, 449 U.S. 490, 506 (1981) (explaining that Congress has power to impose "prerequisites to the acquisition of United States citizenship" by naturalization). Finally, Congress directed the judiciary, not the President, to determine citizenship claims. *See* 8 U.S.C. § 1503(a) (providing that any person claiming that their citizenship has been improperly denied "may institute an action . . . for a judgment declaring him to be a national of the United States").

Here, Congress's citizenship powers under Article I and the Fourteenth Amendment intersect with both the President's Article II diplomatic reception duties and the federal courts' Article III judicial powers over citizenship claims. At such an intersection, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The President's reception of a person as a

diplomat is conclusive under Article II. But whether the President has, in fact, received a diplomat such that the diplomat's children are not entitled to birthright citizenship is a question about the Fourteenth Amendment that the Constitution and Congress has charged the courts with answering. After all, "[w]hatever power the United States Constitution envisions for the [President] in its exchanges with other nations . . . it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). The same goes for the "precious right" of citizenship. *See United States v. Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007). Thus, "in the absence of a controlling provision of the Constitution," no legislation or executive action denying a person's citizenship "can constrain or permit the judiciary to refuse to give full effect to the peremptory and explicit language of the fourteenth amendment." *Wong Kim Ark*, 169 U.S. at 694.

To review, Moncada's claim to birthright citizenship depends on whether he was born "subject to the jurisdiction" of the United States or instead was immune from such jurisdiction. Whether he held immunity depends on whether the President received his father, Dr. Moncada, as a diplomat with the resulting family-level diplomatic immunity. The Secretary argues that the district court erred by declining to view the Certificate as conclusive evidence that President Truman received Dr. Moncada as a diplomat. Moncada argues that the district court was correct to look beyond the Certificate, but that it clearly erred in finding that Dr. Moncada and his family were immune when he was born. We begin by deciding whether the Certificate is conclusive evidence—despite conflicting facts in the record—that Dr. Moncada held diplomatic immunity at Moncada's birth and thus that Moncada is not a birthright citizen. We hold that

the Certificate is not conclusive here, so we may look beyond it to the other executive branch evidence. Considering the full record, we ask whether the district court clearly erred in finding that the evidence proves clearly and convincingly that Moncada was not born "subject to the jurisdiction" of the United States. Finding no clear error, we must reject Moncada's claim to birthright citizenship.

## A. The Certificate is not conclusive evidence of Moncada's non-citizenship.

The President's exclusive power to receive diplomats means that courts "do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister." *In re Baiz*, 135 U.S. at 432. In *Baiz*, the question was whether petitioner—a Guatemalan consul general—was also a foreign minister, thereby vesting the Supreme Court with exclusive jurisdiction in a libel action against him. *Id.* at 417–18 (quoting Revised Stats. § 687 (1789)). In the opinion's final paragraph, the Court explained that because it did not question the executive's decision to receive a person as a diplomat, it "therefore ha[s] the right to accept the certificate of the state department that a party is or is not a privileged person, and cannot properly be asked to proceed upon argumentative or collateral proof." *Id.* at 431–32.

The Secretary does not cite any statute or regulation providing for such certificates or their evidentiary effect. *See also Muthana v. Pompeo*, 985 F.3d 893, 912 (D.C. Cir. 2021) (Tatel, J., concurring) (doubting whether "a longstanding formal procedure for communicating the Executive's view of diplomatic status to the court exists"); *cf.* 22 C.F.R. § 150.2 (2024) (authorizing the government to determine diplomatic immunity "in accordance with

relevant international and domestic law"). Instead, the Secretary argues that this passage from *Baiz* requires a court to hold that the Certificate conclusively establishes an individual's immunity status, to the exclusion of other record evidence.

But while *Baiz* recognized that "the decision of the executive" to receive a diplomat is conclusive, we do not read it to hold that courts' "right to accept the certificate" as evidence of that decision also imposes on courts a separate duty to do so. *In re Baiz*, 135 U.S. at 432. This is at least the case where other executive records may confirm or conflict with an immunity claim. For example, in *Baiz* the government declined to provide the district court with an official certification of petitioner's diplomatic immunity. *See id.* at 430. So the Court affirmed based on other evidence, including correspondence and other executive branch records like those presented here. *Id.* at 425–31.

The *Baiz* Court drew from two earlier cases that each considered evidence establishing the fact of a President's reception of a foreign representative even as the court accorded the reception itself as legally conclusive of diplomatic status. In *United States v. Liddle*, the court explained that "the certificate of the secretary . . . is an acknowledgment by the government that [an individual] is received and considered as entitled to the character attributed to him." 26 F. Cas. 936, 936 (C.C.D. Pa. 1808) (Washington, J.) (explaining that "[t]he certificate of the secretary is good evidence, and the best to prove" diplomatic immunity). But it then turned to "parol proof," which was "proper" to "fix the time when the privileges [of the diplomat] commenced," *id.*, similar to the documentary timeline of Dr. Moncada's diplomatic status here.

And in a second case, the court rejected evidence of a diplomat's appointment by his home country, holding that "[t]he only proper inquiry" when determining a foreign representative's diplomatic status is whether the individual has "been received and recognized as such by the executive of this government." *United States v. Ortega*, 27 F. Cas. 359, 362 (C.C.E.D. Pa. 1825) (Washington, J.), *certified question answered sub nom. Ortega*, 24 U.S. 467. Yet after setting aside the evidence of the diplomat's home-country appointment by Spain, the court continued its inquiry into the diplomat's host-country reception by the United States. And it put to the jury the question of whether the victim was "a foreign minister, at the time the alleged offence was committed," based on official testimony and correspondence from the Secretary. *Id.* at 360–61. So it was "evidence of *those facts*" about the President's reception—found by the jury and based on the Secretary's testimony and records— that was "conclusive" of his immunity status. *Id.* at 362 (emphasis added).

In the Supreme Court's first application of *Baiz* it summarized the rule: "[a]s to international affairs, such as the recognition of a foreign government, or of the diplomatic character of a person claiming to be its representative, [courts] may inquire of the . . . department of state." *Jones*, 137 U.S. at 216. So it opened with the observation that "it is not material to inquire, nor is it the province of the court to determine, whether the executive be right or wrong; it is enough to know that in the exercise of his constitutional functions he has decided the question." *Id.* at 221. Then it proceeded to conduct a detailed examination of "documents from the state department" to determine what the President had, in fact, decided. *Id.* at 221–24. Only after consideration of these records did the Court conclude that "[t]he

subsequent action of the president, through the appropriate departments, has put the matter beyond all question." *Id.* at 223. Ultimately, the Court held, "the duty of the judiciary is to decide in accordance with what the president, in the exercise of a discretionary power confided to him by the constitution and laws, *has actually done*." *Id.* at 221 (emphasis added).

Put differently, under *Baiz* we need not credit the Secretary's certification of a foreign representative's status, presented during litigation, "to the exclusion of all other Executive evidence." *See Muthana*, 985 F.3d at 914 (Tatel, J., concurring). As the Supreme Court later explained in defining these extents of executive and judicial power, "though it is the executive that determines a person's status as representative of a foreign government, *Ex parte Hitz*, 111 U.S. 766 (1884), the executive's statements will be construed where necessary to determine the court's jurisdiction, *In re Baiz*, 135 U.S. 403." *Baker v. Carr*, 369 U.S. 186, 213 (1962) (internal citations cleaned up for consistency). The same holds true here, where construing the executive's statements is necessary to determine whether a person is "subject to the jurisdiction" of the United States.

Other circuit courts of appeals read *Baiz* more broadly. But they do so outside the special burden of proof required in citizenship cases and in the absence of the conflicting evidence presented here. *See, e.g.*, *United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) (declining to review the Secretary's factual determination on immunity when presented with an official certification); *Abdulaziz v. Metro. Dade Cnty.*, 741 F.2d 1328, 1331 (11th Cir. 1984) (relying on the Secretary's certification and declining to inquire into whether petitioner was protected by the Vienna Convention on Diplomatic Relations); *United States v.*

*Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) (reasoning that "recognition by the executive branch—not to be second-guessed by the judiciary—is essential to establishing diplomatic status" without commenting on the conclusive evidentiary authority of the Secretary's certification). These cases do not address the issue before us: whether the Certificate alone deprives a district court of its fact-finding powers when there is conflicting evidence about whether the President received a person as a diplomat.

Only the Court of Appeals for the D.C. Circuit in *Muthana* accepted the Secretary's certification of an individual's immunity status as conclusive—despite conflicting evidence to the contrary—both of that status and of a lack of citizenship under the Citizenship Clause. 985 F.3d at 908–09. As discussed above, we agree with the *Muthana* court that the President has the exclusive power to receive diplomats under Article II. But we disagree that this power binds courts when presented with a certificate that purports to resolve disputed questions of fact as to whether the President has actually done so. *See id.* at 912 (Tatel, J., concurring) (declining to accept conflicting certifications of past diplomatic status as conclusive). And because this case presents a distinct constitutional question under the Citizenship Clause, we decline to extend the Court's reasoning in *Baiz* to allow a contested certificate to serve not as a shield defending a person from judicial process, but as a sword defeating a person's claim to citizenship.

So while a certificate may be important evidence for courts to consider in making a factual determination of whether the President received a person as a diplomat, it is not conclusive to the exclusion of conflicting evidence of that fact. Rather, it represents the executive branch's current view of the facts bearing on whether the President did, at

some time in the past, receive that person as a diplomat. Just as the Supreme Court has done in similar cases, we consider the Secretary's certificate in the context of a broader record of executive branch documents. Here, as explained below, there is conflicting evidence in the record about whether the President had received Dr. Moncada as a diplomat when his son was born. Thus, we proceed to review the district court's findings, including its consideration of the Certificate, and "decide in accordance with what the president, in the exercise of a discretionary power confided to him by the constitution and laws, has actually done." *Jones*, 137 U.S. at 221.

### B. The district court did not clearly err in finding clear and convincing evidence that Moncada is not a citizen.

A person claiming United States citizenship bears the burden of producing "substantial credible evidence" of that fact. *Mondaca-Vega*, 808 F.3d at 419 (quoting *Ayala-Villanueva v. Holder*, 572 F.3d 736, 737 n.3 (9th Cir. 2009)). If the person does so, the burden shifts to the government to prove lack of citizenship "by clear and convincing evidence." *Id.* (internal quotation marks omitted). This clear and convincing burden of proof "matches the gravity of the task" in proceedings, such as this one, that may deprive a person of the United States citizenship to which they may be rightfully entitled. *Id.* at 422; *see Nishikawa v. Dulles*, 356 U.S. 129, 138 (1958) (Black, J., concurring) (observing that when an individual is born in the United States and entitled to rights of citizenship, "neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert" can strip away that right).

Evidence of a valid United States passport is "substantial credible evidence" of United States citizenship. *See Mondaca-Vega*, 808 F.3d at 419 (citing *Ayala-Villanueva*, 572 F.3d at 737 n.3); *see also* 22 U.S.C. § 2705 (providing that a passport has the "force and effect as proof of United States citizenship"). The parties stipulated that Moncada was issued United States passports or passport cards at least five times over the past seventy years. So the Secretary must show, by clear and convincing evidence, that Dr. Moncada had diplomatic immunity when Moncada was born, and therefore that Moncada was born outside the jurisdiction of the United States.

The district court found conflicting evidence of Dr. Moncada's diplomatic immunity, but it discounted Moncada's evidence as lacking sufficient weight. Along with the Certificate, the Secretary produced the bulk of the evidence at trial: Donovan's credible testimony about diplomatic processes and records; the U.S. Mission to the U.N. "Blue List," the registry of individuals with diplomatic immunity, which includes Dr. Moncada's name and title as an attaché; the U.S. Host Country Affairs Section's KARDEX registry of biographical information for Dr. Moncada and his family; and U.N. General Assembly records where Dr. Moncada spoke to the body in a diplomatic capacity. Of particular importance are "Blue List" documents because they may "constitute [] presumptive evidence that [Moncada] enjoy[ed] diplomatic status." Restatement (Third) of Foreign Relations Law § 464 (Am. L. Inst. 1987). Each piece of evidence shows that Dr. Moncada enjoyed diplomatic immunity when his son was born.

But Moncada presented evidence to the contrary, including President Truman's May 1949 exequatur with Dr.

Moncada listed as "Deputy Consul," Moncada's birth certificate that lists his father's occupation as "Consul," and the absence of Moncada's name among the Moncada children listed on the KARDEX. Also, some of Donovan's trial testimony conflicts with the "reasonable—if not inevitable—inference" of Moncada's citizenship status. *See Mondaca-Vega*, 808 F.3d at 426. For example, Donovan testified that he did not have any knowledge of how or where Dr. Moncada spent most of his time while he represented Nicaragua at the U.N. This was an important concession because that information would have been helpful circumstantial evidence of his job description and title. Moncada also relies on various documents noting that Dr. Moncada lacked full diplomatic immunity status, due in part to confusion of the "Blue List" of diplomats at the embassy in Washington D.C. (which did not list Dr. Moncada) with the "Blue List" of diplomats at the permanent mission to the U.N. in New York City (which did list Dr. Moncada). And again, the Secretary did not produce any contemporaneous certification of when, exactly, the President received Dr. Moncada as a diplomat.

Still, as the fact finder, "the district court was entitled to discount this evidence." *Mondaca-Vega*, 808 F.3d at 427. And "[b]ased 'on the entire evidence,' we are not 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 428 (quoting *Anderson*, 470 U.S. at 573). Thus, on the record before it, the district court did not clearly err in finding that Dr. Moncada held diplomatic immunity when his son was born. *See Chaudhry v. Aragon*, 68 F.4th 1161, 1171 (9th Cir. 2023). Therefore, Moncada also held diplomatic immunity. And if he was immune from the

jurisdiction of the United States at birth, then he is not a birthright citizen under the Fourteenth Amendment.[1]

## III.  Conclusion

"[I]n the absence of a controlling provision of the constitution," we must "give full effect" to our country's guarantee of birthright citizenship to all who are subject to its jurisdiction. *Wong Kim Ark*, 169 U.S. at 694. The Constitution confers on the President alone the legal duty to receive diplomats and thereby immunize those diplomats from the jurisdiction of the United States. But two centuries of cases teach that whether the President has, in fact, received and immunized a person as a diplomat remains a fact question for judicial inquiry. This is so even when the Secretary certifies one view of a contested executive branch record. And it is especially so when, as in this case, the question of diplomatic immunity conferred under Article II merges into a question of birthright citizenship under the Fourteenth Amendment.

The district court did not clearly err in finding that clear and convincing evidence proved that Moncada was born

---

[1] Moncada also argues that his mother's status when he was born provides an independent basis for his claim to birthright citizenship. This argument was raised fleetingly at best in the district court, so that court did not reach a legal conclusion on the issue. His argument begins with the premise that she was a national of the United States by virtue of her purported status as a lawful permanent resident. However, a lawful permanent resident was not then, and is not now, a "national of the United States." Nationality Act of 1940, Pub. L. No. 76-853, § 101(b), 54 Stat. 1137, 1137 (1940) ("The term 'national of the United States' . . . does not include an alien.") (repealed 1952); Johnson-Reed Act of 1924, Pub. L. No. 68-139, § 28(b), 43 Stat. 153, 168 (1924) (defining "alien") (repealed 1952); *cf.* 8 U.S.C. § 1101(a)(15), (20), (22). So this argument also fails.

with diplomatic immunity, and thus did not acquire birthright citizenship. The district court also observed that "[i]t is impossible to conclude that this is justice," and we share its concern about this outcome. The government, for its part, concedes that its decades of mistakes led to this "very unfortunate and regrettable situation." But as inequitable as this result is, courts lack the equitable power to remedy the government's errors by granting Moncada citizenship. *See INS v. Pangilinan*, 486 U.S. 875, 885 (1988).

Formality is a virtue of birthright citizenship. It requires no inquiry into lineage but is "restricted only by place and jurisdiction." *Wong Kim Ark*, 169 U.S. at 676. Yet when circumstances leave a person immune from the jurisdiction of the United States at birth, this same formality requires a court to "give full effect" to that restriction. *Id.* at 694. Thus, we affirm the judgment of the district court.[2]

**AFFIRMED.**

---

[2] Moncada raises a separate issue: the district court erred in dismissing his claims under the Citizenship Clause and Administrative Procedure Act. We review a motion to dismiss de novo. *Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021). Moncada's Citizenship Clause claim is practically identical to the 8 U.S.C. § 1503 claim resolved at trial, so any error by the district court in dismissing it would be harmless. *See Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1353 (9th Cir. 1984). Moncada's APA claim under 5 U.S.C. § 704 fails because he also sought a citizenship determination under 8 U.S.C. § 1503, which provides an adequate remedy for his alleged injury. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011).